OPINION. Arundell, Judge: Respondent has reallocated contract costs of the joint venture of which petitioner was a member for the fiscal years ended March 31, 1943 and 1944, in direct proportion to its contract receipts in those years. In so doing, respondent relies upon the provisions of sections 41, 42, and 43 of the Internal Revenue Code and claims that the system used by him more clearly reflects the true income of the joint venture and the petitioner’s distributable share thereof. The joint venture kept its books and filed its Federal income tax returns on the cash receipts and disbursements basis for fiscal years ended March 31 of each year. In contracting with the Government in April 1942, the joint venture anticipated completing the contract prior to the end of its first fiscal year on March 31,1943, and it appears that the fiscal year was so chosen to avoid overlapping construction income and costs into a second taxable year. Except for various details, all of the work under the contract was completed and had been approved and accepted by the Government prior to March 31, 1943. On March 24, 1943, the joint venture was orally advised by the Price Adjustment Section of the War Department that $700,000 of its profits were considered to be excessive and that the final payment under the contract in the amount of $362,778.33 had been frozen. It was not until August 11, 1943, that the joint venture received the withheld payment. Respondent included in the gross income of the joint venture in each fiscal year the amounts actually received under the contract, or $4,191,954.84 in the fiscal year ended March 31, 1943, and $362,778.33 in the fiscal year ended March 31, 1944. As the joint venture kept its books on the cash receipts arid disbursements basis and had no present right to receive the $362,778.33 on or before March 31, 1943 we believe that the respondent was correct in his treatment of contract receipts. However, in the determination of the net profits of the joint venture for both years, respondent reallocated contract costs between the two fiscal years involved. Although approximately 98 per cent of the costs was actually paid in the fiscal year ended March 31, 1943, respondent readjusted costs to conform with the percentage of contract receipts in each year, including 92.035 per cent of costs in the fiscal year ended March 31, 1943, and 7.965 per cent in the fiscal year ended March 31, 1944. In this respect, we believe the respondent was in error. Generally, four recognized accounting systems were available to the joint venture. It could have kept its books on the accrual, percentage of completion, completed contract, or cash method. It chose the latter method. Respondent concedes that in his reallocation he substituted a “hybrid” system in an effort to compromise on a uniform basis with all three members of the joint venture. The Supreme Court, in Security Flow Mills Co. v. Commissioner, 321 U. S. 281, clearly disposed of the Commissioner’s right to arbitrarily substitute such a system for that ordinarily employed by the taxpayer with the following statement: This legal principle has often been stated and applied. The uniform result has been denial both to government and to taxpayer of the privilege of allocating income or outgo to a year other than the year of actual receipt or payment, or applying the accrual basis, the year in which the right to receive, or the obligation to pay, has become final and definite in amount. In reference to the provisions of section 43, the Court stated: We p.re of opinion that the purpose of the language which Congress used was not to substitute, whenever in the discretion of an administrative ofiicer or tribunal such a course would seem proper, a divided and inconsistent method of accounting not properly to be denominated either a cash or an accrual system. Regulations 111, section 29.43-2, also indicates that a departure from the cash or accrual systems is justified only where there would otherwise be a material distortion of a taxpayer’s true income. * * * The expenses, liabilities, or deficit of one year cannot be used to reduce the income of a subsequent year. A taxpayer has the right to deduct all authorized allowances, and it follows that if he does not within any year deduct certain of his expenses, losses, interest, taxes, or other charges, he cannot deduct them from the income of the next or any succeeding year. It is recognized, however, that particularly in a going business of any magnitude there are certain overlapping items both of income and deduction, and so long as these overlapping items do not materially distort the income they may be included in the year in which the taxpayer, pursuant to a consistent policy, takes them into his accounts. [Cf. Burnet v. Sanford & Brooks Co., 282 U. S. 359.] We can find no reason herein requiring the costs of the joint venture to be apportioned under such a system as employed by the respondent. Therefore, it is our opinion that the income of the joint venture for the taxable years 1943 and 1944 may be properly determined under the cash receipts and disbursements system of accounting it used in those years. What we have said so far we think serves to dispose of the only strict tax question raised in this proceeding. However, in determining the deficiency in this case, the respondent eliminated from the income of the petitioner and the joint venture the excessive profits repaid to the Government and treated the credit allowed petitioner under section 3806 incident to the renegotiation of . its war contracts as in the nature of a rebate under section 271 (b) (2) of the Internal Eevenue Code, with a result that we do not think is contemplated by the statute. The correct tax liability of a taxpayer is, in the first instance, to be determined with complete disregard of the fact that the taxpayer may have repaid amounts representing excessive profits to the Government incident to renegotiation and in making the payments received the benefit of the credit provided for by section 3806 (b) (1). Petitioner’s tax liability for 1943 should be computed on the basis of the gross income, deductions, and net income as shown on the return, arid such other adjustments as may be required, including any resulting from the instant redetermination-, so that the tax as finally computed meets the requirements of the statute. It follows that under this method the full amount of taxes paid by the petitioner should be applied against the total tax liability in determining the amount of any deficiency or overpayment, and the respondent should not, in this computation, treat the credits previously computed under section 3806 (b) (1) as rebates within the definition contained in section 271 (b) (2). It is not until the tax liability as such has been correctly determined that we have a basis for the computation of the credit under section 3806, and if a credit has been allowed for renegotiation purposes prior to the final determination of the tax liability as such, then the credit must be regarded as tentative and must necessarily fluctuate up or down, dependent upon what is finally determined to be the petitioner’s correct tax liability. The sole tax question presented for our consideration has been decided in favor of the taxpayer, and it might seem at first glance to leave the parties where they were. But it appears from the deficiency notice that there were other adjustments that were not contested which would serve to affect petitioner’s tax liability and so a recomputation becomes necessary. We think what we have said serves to dispose of this case and other questions raised in the pleadings as to the proper method of applying the credit need not be discussed. The application of the credit under section 3806 is an administrative one, and as the determination of petitioner’s tax liability is in nowise affected by the manner of the application of the credit, there is no occasion for us to discuss it in this opinion. Whether the determination of excessive profits made by the Under Secretary of War is increased or decreased by the decision of this Court in the renegotiation proceedings, it will in no way affect the petitioner’s tax liability for 1943 which we have here finally determined. Any finding as to excessive profits different from that initially made by the Under Secretary of War will be given final effect by a recomputation of the credit under section 3806. As we have previously stated, until that time, any credit allowed the petitioner under section 3806 will necessarily be tentative, a final credit being determinable only at such time as a final determination of the excessive profits is made. Reviewed by the Court. Decision will be entered under Bule 50.