114 T.C. No. 16


UNITED STATES TAX COURT



RACMP ENTERPRISES, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent



Docket No. 23954-97.                Filed March 30, 2000.


     P is a construction contractor that enters into
contracts to construct, place, and finish concrete
foundations, driveways, and walkways for real property
developers.  P uses the cash method to recognize income
and to expense the cost of concrete and other
materials.  R determined that the material P uses in
providing service to its clients is "merchandise" under
sec. 1.471-1, Income Tax Regs., and that P must report
its income on the accrual method of accounting.
     <u>Held</u>:  P's contract to provide labor and material
to a real property developer is a contract to provide
service, and the material is an indispensable and
inseparable part of the provision of that service.  See
<u>Osteopathic Med. Oncology & Hematology, P.C. v.
Commissioner</u>, 113 T.C. 376, 384 (1999).
     <u>Held</u>, <u>further</u>, material that is provided by a
construction contractor according to the terms of a
contract that requires the provision of labor and
material, and which, when combined with other tangible
personal property, loses its separate identity to
become an integral and inseparable part of a building
or other real property, is not merchandise within the

meaning of sec. 1.471-1, Income Tax Regs.

Held, further, under the facts of this case, R abused his discretion in determining that P must use the accrual method of accounting to report its income for Federal income tax purposes.

Kevin P. Courtney, for petitioner.

Steven Walker, for respondent.

PARR, Judge:[*]  Respondent determined an $82,577 income tax deficiency for petitioner's tax year ended August 31, 1994, and a section 6662[1] accuracy-related penalty of $16,515.

The issues for determination are:  (1) Whether the material provided by petitioner in accordance with its contract to construct and place concrete foundations, driveways, and walkways is merchandise within the meaning of section 1.471-1, Income Tax Regs.  We hold it is not.  (2) Whether respondent abused his discretion in determining that petitioner's use of the cash method of accounting did not clearly reflect its income.  We hold he did.  (3) Whether petitioner is liable for an accuracy-related penalty.  Because of our disposition of the preceding issues, we need not address this issue.

---

[*]This case was reassigned to Judge Carolyn Miller Parr by order of the Chief Judge.

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year at issue.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of facts and the attached exhibits are incorporated herein by this reference. At the time the petition in this case was filed, petitioner was a California corporation with its principal place of business in Gilroy, California, where it had a small office and an equipment yard.

Petitioner is a licensed contractor in the State of California, holding a class C-8 license to construct, place, and finish concrete foundations and flatwork. The term "flatwork" means driveways and walkways.

Petitioner used concrete, sand, drain rock, and various hardware items (wire mesh, rebar, anchor bolts and rods, holddowns, P.A. straps, column bases, post bases, and drain piping), to perform its contracts.

The concrete, sand, rock, and hardware items were delivered to the construction site, not to petitioner's equipment yard or office. The invoices show that during the year at issue, the cost of sand was $6.50 per ton and drain rock $11.65 per ton. Occasionally, when the construction site became congested, petitioner would put some of the hardware items in the back of a truck, store the truck in its equipment yard overnight, and return it to the construction site the following day. Petitioner had a metal storage container similar to the type of containers

used on cargo ships at its equipment yard that it used to store equipment and some hardware items.

The Construction Cycle

A.  The Bid

During the year at issue, petitioner performed its construction activity in the following manner.  Petitioner obtained a set of building plans from a developer and then visited the construction site to evaluate the soil, weather, and traffic conditions, and to ascertain the location of the materials suppliers.  Petitioner calculated its bid price by summing its estimates of the cost of the labor and materials required to perform the work plus a margin for profit based upon the cost of the labor, the quantity of materials, and the complexity of the job.

The following is a typical bid worksheet prepared by petitioner:

### Typical Bid Worksheet

| | |
|---|---|
| Ready-mix concrete | $547.80 |
| Sand | 225.00 |
| Other materials | 69.44 |
| Other materials | 7.70 |
| Other materials | 4.80 |
| Total | 854.74 |
| Tax (8.5%) | 72.65 |
| Total materials cost | 927.39 |
| | |
| Plus labor | 477.20 |
| Equals | 1,404.59 |
| | |
| Plus 15% profit | 210.69 |
| Total | 1,615.28 |

B.  <u>The Contract</u>

If petitioner's bid was accepted by the developer, a written contract was executed to construct, place, and finish the required foundations and flatwork.  The parties stipulated that a typical contract between petitioner and its clients provided the following:

In consideration of the mutual agreements contained herein, Contractor and Subcontractor [petitioner] agree as follows:

1.  <u>Work.</u>  The work to be performed hereunder shall include, and Subcontractor shall perform, all duties and services necessary or inherent to the type and trade classification of <u>FOUNDATION & FLATWORK</u>, the scope of which is more fully defined in <u>Exhibit A</u> - <u>Scope of the Work</u>, hereto (the "Work").  The Work shall include all work of such type and trade classification for the Project, and is to be performed in strict compliance with this Subcontract and the Contract Documents (as defined in Paragraph 9 hereof) and all addenda, amendments and changes thereto, whether or not stipulated in the Contract Documents, and shall include all work ordinarily and usually performed, and the supply of all facilities ordinarily and usually provided as part of the Work covered by this Subcontract or ordinarily and usually performed by a subcontractor doing work of such trade classification. Subcontractor, to the entire satisfaction and approval of Contractor (or its authorized representatives and/or assigns) and all governing agencies agrees to furnish sufficient labor, materials, tools, equipment and services and to properly perform the Work in a sound workmanlike and substantial manner.  Subcontractor is employed by Contractor as an independent contractor to perform the work.

\*     \*     \*     \*     \*     \*     \*

15.  Materials and Workmanship; Inspection and Testing

(a)  All materials used in the Work shall be furnished in ample quantities to facilitate the proper and expeditious execution of the Work and shall be new

and of the most suitable grade of their respective kinds and purpose. At the request of the Contractor, Subcontractor shall furnish to Contractor for approval, full information and/or samples concerning the materials or articles which Subcontractor intends to incorporate in the Work. The materials actually used in the Work shall conform to the information or samples approved. Machinery, equipment, materials and articles installed or used without such approval shall be used by Subcontractor at the risk of subsequent rejection by Contractor.

(b) Except as otherwise provided herein, all material and workmanship, if not otherwise designated by the Contract Documents, shall be subject to inspection, examination and test by Contractor at any and all times during manufacture and/or construction and at any and all places when such manufacturing or construction are carried on. Contractor shall have the right to reject improper or defective material or workmanship or require correction without charge to Contractor. Subcontractor shall promptly segregate and remove rejected material from the Project Site. Nothing contained in this Paragraph 15 shall in any way restrict the rights of Contractor under any warranty by Subcontractor of material or workmanship.

16. Warranty; Customer Service

(a) Subcontractor warrants and represents to Owner and to Contractor that the workmanship of the Work, all materials and equipment furnished for the Work, and all other aspects regarding the Work to be performed under this Subcontract shall be in conformance with this Subcontract and the Contract Documents, be of finest quality, and be free from faults and defects of design, material and Workmanship for a period of two (2) years from (i) the date of the initial occupancy of the particular residential unit for which an applicable portion of Subcontractor's Work was performed or (ii) for such longer period as may be required by FHA, VA and/or other applicable governmental authorities. Subcontractor agrees to satisfy its warranty obligations upon receipt of written notice from Contractor requiring same without cost to Contractor. The remedies provided in this Paragraph 16(a) shall not be restrictive but shall be cumulative and in addition to all other remedies of

Contractor hereunder and under California law, including all laws related to latent defects or fraud. If Contractor reasonably deems it more expedient to correct any of the Work covered by warranty itself because of any delay by Subcontractor, a "backcharge" may be made pursuant to Paragraph 23 below.  This provision shall be binding upon the successors and assigns of Subcontractor and shall benefit the successors and assigns of the Contractor; including purchasers of residences within the Project.

* * * * * * *

Exhibit A, Specific Scope of Work, of the contract provided the following:

1.  General
a.   Subcontractor is responsible for all materials until final installation and acceptance by CONTRACTOR.  Any loss due to theft or breakage prior to acceptance by CONTRACTOR shall be replaced by SUBCONTRACTOR at no additional charge to CONTRACTOR.

b.   SUBCONTRACTOR agrees herein that any labor, materials, and/or workmanship that does not comply to the CONTRACTOR'S standards shall be removed and replaced to conform to the CONTRACTOR'S  standards.

c.   SUBCONTRACTOR further agrees that the quality of his workmanship and his materials shall be in strict accordance with the plans and these specifications.

* * * * * * *

e.   SUBCONTRACTOR shall warranty all concrete foundation work for two years from acceptance of work by CONTRACTOR.

## C. Performance of the Contract

Petitioner began performance of the contract by constructing the concrete forms on the ground out of lumber in accordance with the developer's blueprints. After the placement of the forms was accepted by the developer, fill sand and drain rock were spread within the forms according to the plan specifications. Petitioner cut wire mesh and rebar to size and placed them within the forms and engaged a carpenter subcontractor for the correct placement of the other hardware items. Once the form work was inspected and accepted by the developer, petitioner ordered delivery of the ready-mix concrete.

Ready-mix concrete is composed of water, cement, and aggregate, which are mixed together to a mudlike consistency. The concrete must be poured within 3 or 4 hours after the water is introduced to the cement; the concrete cannot be poured after this length of time as it changes from a liquid into a solid.

Petitioner ordered concrete from a supplier that delivered it to the construction site. Petitioner did not manufacture, deliver, or store the concrete. In a typical transaction, petitioner placed the order with the concrete supplier's dispatcher by telephone, specifying the quantity of concrete and the time and place of delivery. The concrete supplier's invoice provided that petitioner was liable for payment for the concrete. After the order was placed, the concrete supplier sent a

California Preliminary Lien Notice to the developer and a copy to petitioner. The preliminary lien notice notified the developer that construction material would be or had been furnished to the construction site, and, if the bill was not paid in full, a mechanic's lien could be placed against the developer's real property.

The mixed concrete was delivered by the manufacturer's truck to the construction site where, if the concrete was accepted, it was poured directly into the form. Petitioner would distribute the concrete evenly throughout the form, install the anchor bolts, and then use various tools to do finishing work.

"Finishing work" includes ensuring that the foundations and flatwork are plumb and smooth and that the driveways and walkways have the proper slope to ensure drainage where appropriate. Some jobs called for decorative finishing work, such as adding a design or pattern to the finished surface. At the end of the day, petitioner did not have any concrete left on hand, and the amount wasted was de minimis.

In order to track the quantity of concrete and the time of delivery, the concrete supplier's drivers carried "batching tickets" which showed the amount of concrete and the arrival time, pour time, and departure time of the truck. Petitioner signed the "batching ticket" to acknowledge the delivery. Acceptance of the concrete was controlled by the developer, not

petitioner. The type and quality of the concrete was specified by the builder's plans. When the concrete arrived at the developer's building site, either petitioner or a quality control technician in the employ of the developer could reject the batch. However, if petitioner was willing to accept the batch, but the quality control technician determined that the batch should be rejected, the batch would be rejected. The quality control technician took a sample of the concrete batch during the pour for a "slump test". The developer had 45 days after taking the sample to reject the concrete if it failed the test.

D.   Billing and Payment

After the sand and drain rock had been spread, the hardware items installed, and the concrete poured and finished, petitioner received an invoice for the cost of the materials and a lien release, which also stated the cost of the materials, from each of the materials suppliers. At the end of the month, petitioner submitted the suppliers' lien releases and a single invoice for the cost of the completed work to the developer for payment. The invoice did not itemize the costs of the labor and material or the amount of the profit.

The developer paid for the construction work in a two-part process. First, the developer issued a joint check made payable to petitioner and each supplier for the cost of the materials as stated on each suppliers' lien release and invoice. Petitioner

endorsed each joint check and forwarded it to the appropriate supplier; petitioner did not deposit or otherwise cash this check.

Second, the developer issued a check made payable only to petitioner for the balance owed on its invoice.

E.    Method of Accounting

Petitioner filed its Federal income tax returns using a fiscal year ending on August 31.  Petitioner used the cash method of accounting to report its taxable income for the first year of its incorporation, the one in issue.  The parties stipulated that petitioner's gross receipts have not exceeded $5 million per year since its incorporation.

Petitioner reported as income payments that it actually received from developers during the taxable year and reported a deduction for the cost of materials for which payments actually were made.  Petitioner did not report as income payments that it did not receive nor did petitioner deduct the cost of materials for which payment had not been made during the taxable year.  Petitioner reported $64,806 of taxable income, and the parties stipulated  that under the accrual method of accounting petitioner's taxable income would be $267,428.

For the taxable year at issue, petitioner reported gross receipts of $1,564,045, which derived solely from the construction, placement, and finishing of foundations and

flatwork.  Petitioner reported as cost of goods sold the total cost of all material used in its construction activity during the taxable year at issue, $993,777.  This sum comprised the following amounts:

| Item | Amount | Percentage |
|------|--------|------------|
| Concrete | $642,923 | 64.7 |
| All other material[1] | 334,563 | 33.7 |
| Lumber[2] | 16,291 | 1.6 |
| Total | 993,777 | 100.0 |

[1]"All other material" is all the other material that went into construction of the foundations and flatwork, except the concrete; it includes fill sand, drain rock, and the various hardware items.  According to the typical bid worksheet, the cost of the hardware items is 5.07 percent of the contract price (the total cost of the materials, other than concrete and fill sand, $81.94 ($69.44 plus $7.70 plus $4.80) divided by the contract price,$1,615.28), and 9.59 percent of the total cost of the materials ($81.94 divided by $854.74).

[2]Respondent stipulated that the lumber is a supply.

Petitioner's accounts receivable and accounts payable at the end of the taxable year at issue were $294,436 and $60,143, respectively.

OPINION

We must decide whether the provision of material by petitioner in performing its service contracts is the sale of "merchandise" for purposes of section 1.471-1, Income Tax Regs.

We decide this issue in the context of whether it was an abuse of respondent's discretion to exercise his authority under section 446 to require petitioner to change from the cash method

to the accrual method.[2]  The Commissioner is granted broad discretion in determining whether a taxpayer's use of a method of accounting clearly reflects income.  See sec. 446(b); United States v. Catto, 384 U.S. 102, 114 & n.22 (1967); Commissioner v. Hansen, 360 U.S. 446, 468 & n.12 (1959); Lucas v. American Code Co., 280 U.S. 445, 449 (1930).  A prerequisite to the Commissioner's exercise of authority to require a taxpayer to change its present method of accounting is a determination that the method used by the taxpayer does not clearly reflect income.  See sec. 446(b); Hallmark Cards, Inc. v. Commissioner, 90 T.C. 26, 31 (1988).

Whether an abuse of discretion has occurred depends upon

---

[2]Sec. 446 provides in pertinent part:

SEC. 446.  GENERAL RULE FOR METHODS OF ACCOUNTING

(a) General Rule.--Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

(b) Exceptions.--If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

(c) Permissible Methods.--Subject to the provisions of subsections (a) and (b), a taxpayer may compute taxable income under any of the following methods of accounting--
        (1) the cash receipts and disbursements method;
        (2) an accrual method;
        (3) any other method permitted by this chapter; or
        (4) any combination of the foregoing methods permitted
    under regulations prescribed by the Secretary.

whether the Commissioner's determination is without sound basis in fact or law. See Ansley-Sheppard-Burgess Co. v. Commissioner, 104 T.C. 367, 371 (1995); Ford Motor Co. v. Commissioner, 102 T.C. 87, 91-92 (1994), affd. 71 F.3d 209 (6th Cir. 1995). The reviewing court's task is not to determine whether, in its own opinion, the taxpayer's method of accounting clearly reflects income but to determine whether there is an adequate basis in law for the Commissioner's conclusion that it does not. See Ansley-Sheppard-Burgess Co. v. Commissioner, supra at 371; Hospital Corp. of Am. v. Commissioner, T.C. Memo. 1996-105. Consequently, section 446 imposes a heavy burden on the taxpayer disputing the Commissioner's determination on accounting matters. See Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532-533 (1979). To prevail, a taxpayer must establish that the Commissioner's determination was "clearly unlawful" or "plainly arbitrary". Id.

Despite the broad language of section 471,[3] the Secretary's discretion to require inventory accounting is not unlimited. See Hewlett-Packard Co. v. United States, 71 F.3d 398, 403 (Fed. Cir. 1995); Hallmark Cards, Inc. v. Commissioner, supra; see also

---

[3]Sec. 471(a) provides:

SEC. 471(a). General rule.--Whenever in the opinion of the Secretary the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

Transwestern Pipeline Co. v. United States, 225 Ct. Cl. 399, 639 F.2d 679, 681 (1980) (distinguishing Thor Power Tool Co. v. Commissioner, supra, because in that case "it was an uncontested fact that the property in issue consisted of an inventory of goods held for sale").

Respondent determined that the material petitioner used in its construction activity was merchandise that was income producing, and, therefore, petitioner must use the accrual method of accounting to clearly reflect its income. Petitioner asserts that it is in the business of providing service and that its clients purchase its expertise in constructing, placing, and finishing foundations, driveways, and walkways, not merchandise. Therefore, petitioner contends that its use of the cash method of accounting is proper. We agree with petitioner.

Issue 1. Whether the Material Provided by Petitioner in Accordance With Its Contract To Construct and Place Concrete Foundations, Driveways, and Walkways Is Merchandise

Whether petitioner is required to report its income on the accrual method of accounting instead of the cash method depends on whether petitioner is in the business of selling merchandise to customers in addition to providing service or whether the material provided by petitioner is a supply that is incidental to the provision of the contracted service. See Wilkinson-Beane, Inc. v. Commissioner, 420 F.2d 352, 353-354 (1st Cir. 1970), affg. T.C. Memo. 1969-79; Osteopathic Med. Oncology & Hematology,

P.C. v. Commissioner, 113 T.C. 376 (1999).

By regulation, the Secretary has determined that

> inventories at the beginning and end of each taxable
> year are necessary in every case in which the
> production, purchase, or sale of merchandise is an
> income-producing factor.  The inventory should include
> all finished or partly finished goods and, in the case
> of raw materials and supplies, only those which have
> been acquired for sale or which will physically become
> a part of merchandise intended for sale, * * *.  [Sec.
> 1.471-1, Income Tax Regs.; emphasis added.[4]]

Therefore, a determination of whether the taxpayer produces, purchases, or sells "merchandise" is preliminary to any determination of whether the taxpayer must account for inventory. See Homes by Ayres v. Commissioner, 795 F.2d 832, 835 (9th Cir. 1986), affg. T.C. Memo. 1984-475.

Neither the Internal Revenue Code (the Code) nor the regulations define "merchandise" or "inventory" or clearly distinguish between "materials and supplies" that are not actually consumed and remain on hand, and inventory.  Wilkinson-Beane, Inc. v. Commissioner, supra at 354 (noting "the lack of any clearly pertinent definition of 'merchandise' in the relevant tax sources"); Osteopathic Med. Oncology & Hematology, P.C. v. Commissioner, supra at 382.  Furthermore, the differences that distinguish supplies from merchandise are determined by context

---

[4]Completing the statutory and regulatory scheme, sec. 1.446-1(c)(2)(i), Income Tax Regs., provides that a taxpayer that has inventory must also use the accrual method of accounting with regard to purchases and sales.

and therefore not always readily discernable.  See <u>Wilkinson-Beane, Inc. v. Commissioner</u>, <u>supra</u> at 354 ("Clearly, the meaning of the term must be gathered from the context and the subject.").

Courts have held that "merchandise", as used in section 1.471-1, Income Tax Regs., is an item acquired and held for sale. See, e.g., <u>Wilkinson-Beane, Inc. v. Commissioner</u>, <u>supra</u> at 354-355 (a canvassing of authorities in the accounting field yields several definitions, such as "goods purchased in condition for sale", "goods awaiting sale", "articles of commerce held for sale", and "all classes of commodities held for sale"; the "common denominator * * * seems to be that the items in question are merchandise if held for sale."); <u>Honeywell Inc. v. Commissioner</u>, T.C. Memo. 1992-453 (rotable spare parts are merchandise if they were acquired and "held for sale"), affd. without published opinion 27 F.3d 571 (8th Cir. 1994); see also <u>Grant Oil Tool Co. v. United States</u>, 180 Ct. Cl. 620, 381 F.2d 389, 397 (1967) (inventory is, simply stated, property that is held for sale); <u>Forrester v. Americus Oil Co.</u>, 19 S.E.2d 328, 330 (Ga. Ct.  App. 1942) (inventory includes property held for sale to customers in the ordinary course of trade or business).  It is important to note that all the definitions refer to property that is held for sale, not simply property that is sold.

Congress did not intend by the predecessor of section 471 that all businesses, including some businesses that hold property

primarily for sale, use inventories.  See <u>W.C & A.N. Miller Dev.</u>
<u>Co. v. Commissioner</u>, 81 T.C. 619, 630 (1983); <u>Atlantic Coast</u>
<u>Realty Co. v. Commissioner</u>, 11 B.T.A. 416, 419-420 (1928).  As
indicated by the legislative history, Congress intended the
section to apply to manufacturing and merchandising concerns.[5]

In <u>Osteopathic Med. Oncology & Hematology, P.C. v.</u>
<u>Commissioner</u>, <u>supra</u>, we held that where the inherent nature of
the taxpayer's business is that of a service provider, and the
taxpayer uses materials that are an indispensable and inseparable

---

[5]The original authority for the use of inventories is
contained in Revenue Act of 1918, ch. 18, sec. 203, 40 Stat.
1057, 1060.  Sec. 203 of that Act is almost identical to section
471.  In proposing this legislation, the Committee on Ways and
Means explained:

> In many cases the only way that the net income can
> be determined is through the proper use of inventories.
> This is largely true in the case of manufacturing and
> merchandise concerns.  The bill authorizes the
> Commissioner to require inventories whenever in his
> opinion the same is necessary in order to clearly
> reflect the income of the taxpayer.  [H. Rept. 767,
> 65th Cong., 2d Sess. 88 (1918), 1939-1 C.B. (Part 2)
> 86, 89.]

See Seidman, Seidman's Legislative History of Federal Income Tax
Laws 1938-1861, at 900 (1953).

Pursuant to the authority vested in him by statute, the
Commissioner, with the approval of the Secretary, promulgated
Art. 1581 of Regulations 45 under the Revenue Act of 1918, which
essentially is the same as sec. 1.471-1, Income Tax Regs.  See
Regs. 62, art. 1581; Sec. 29.22(c)-1, Regs. 111 (1944); see also
<u>Burroughs Adding Mach. Co. v. Commissioner</u>, 9 B.T.A. 938, 940
(1927) (Art. 1581 of Regulations 62 contains the same language as
Art. 1581 of Regulations 45); <u>Galedrige Constr., Inc. v.</u>
<u>Commissioner</u>, T.C. Memo. 1997-240 (sec. 1.471-1, Income Tax
Regs., contains the same language as Regs. 111, sec. 29.22(c)-1).

part of the rendering of its services, the materials are not "merchandise" under section 1.471-1, Income Tax Regs.

Petitioner is inherently a service provider. Petitioner's clients, real property developers, engage petitioner to complete foundations, driveways, and walkways. It is the general rule in this country for most areas of the law (including the Uniform Commercial Code (UCC), the Uniform Sales Act (USA), State sales tax laws, the statute of frauds, and the Robinson-Patman Antidiscrimination Act) that <u>a contractor is the consumer of materials and a supplier of services, not the seller of personal property</u>; the courts have invariably found construction contracts that provide for the furnishing of labor and materials to constitute agreements for work, labor, and services rather than the sale of goods.

For example, under the UCC, a highway construction contract requiring a construction company to furnish gravel and other road building materials in the quantities specified and to turn over to the Commonwealth of Massachusetts a completed highway was a contract for work and labor and not a contract for the sale and purchase of personal property. See <u>Saugus v. B. Perini & Sons, Inc.</u>, 26 N.E.2d 1, 3-4 (Mass. 1940). The main objective of a contract to construct a horse barn, which required the provision of materials, was the construction of the barn, not the sale of goods. See <u>Hunter's Run Stables, Inc. v. Triple H Constr. Co.</u>,

938 F. Supp. 166, 168 (W.D.N.Y. 1996). In the construction of such improvements, the labor predominates with the materials being merely an incident thereto. See Cork Plumbing Co. v. Martin Bloom Associates., Inc., 573 S.W.2d 947, 958 (Mo. Ct. App. 1978).

Under the USA, a contract to "furnish the necessary labor and material" for a radiant heating system was a contract for labor and material, not a contract for sale of material. See Aced v. Hobbs-Sesack Plumbing Co., 55 Cal.2d 573, 580-581 (1961). Furthermore, an agreement to build a structure according to another's plans and specifications is not an agreement of sale of any of the materials which may enter into its composition. See United States v. San Francisco Elec. Contractors Association, 57 F. Supp. 57, 67 (N.D. Cal. 1944).

For purposes of State sales tax, the general rule views a building contractor as a supplier of services and a consumer of the building material. See Levine v. State Bd. of Equalization, 299 P.2d 738 (Cal. Ct. App. 1956).[6]

---

[6]See, e.g., Department of Revenue v. Montgomery Woodworks, Inc., 389 So. 2d 510 (Ala. Civ. App. 1980); Raynor Door, Inc. v. Charnes, 765 P.2d 650 (Colo. App. 1988); H.B. Sanson, Inc. v. Tax Commissioner, 447 A.2d 12 (Conn. 1982); King's Bay Yacht & Country Club, Inc. v. Green, 173 So. 2d 509 (Fla. Dist. Ct. App. 1965); Sturtz v. Iowa Dept. of Revenue, 373 N.W.2d 131 (Iowa 1985); Pete Koenig Co. v. Department of Revenue, 655 S.W.2d 496 (Ky. Ct. App. 1983); Miedema Metal Bldg. Sys., Inc. v. Department of Treasury, 338 N.W.2d 924 (Mich. Ct. App. 1983); Blevins Asphalt Constr. Co. v. Director of Revenue, 938 S.W.2d 899 (Mo. 1997); George Rose & Sons Sodding & Grading Co. v. Nebraska Dept.

In considering whether a contract is within the statute of frauds, a contract to "cut, furnish, and deliver" the stonework for a building is essentially one of labor, the "material upon which the work and labor were to be done was simply the incident". Flynn v. Dougherty, 27 P. 1080 (Cal. 1891).

For purposes of the Robinson-Patman Antidiscrimination Act, ch. 592, 49 Stat. 1526 (1936), 15 U.S.C. sec. 13(a) (1994), which prohibits discriminatory pricing in the sale of goods, a construction contract for the provision of labor and materials including 2 million bricks was not a contract for the sale of personal property. See General Shale Prods. Corp. v. Struck Constr. Co., 132 F.2d 425, 428 (6th Cir. 1942).

It is clear from the case law that in the case at hand, the essence of petitioner's typical contract with its clients was for the provision of services, not for the sale of personal property. The fact that the cost of the materials is substantial is insufficient to transmute the sale of a service to the sale of merchandise and a service. See Osteopathic Med. Oncology & Hematology, P.C. v. Commissioner, 113 T.C. at 386; see also North Am. Leisure Corp. v. A & B Duplicators, Ltd., 468 F.2d 695, 697

of Revenue, 532 N.W.2d 18 (Neb. 1995); Chicago Bridge & Iron Co. v. State Tax Commn., 839 P.2d 303 (Utah 1992); Yeargin, Inc. v. Tax Commn., 977 P.2d 527 (Utah Ct. App. 1999); Wisconsin Dept. of Revenue v. Johnson & Johnson, 387 N.W.2d 91 (Wis. Ct. App. 1986); State Bd. of Equalization v. Cheyenne Newspapers, Inc., 611 P.2d 805 (Wyo. 1980).

(2d Cir. 1972) (when service predominates, the incidental sale of items of personal property does not alter the basic transaction.); Aced v. Hobbs-Sesack Plumbing Co., supra at 580; Filmservice Labs., Inc. v. Harvey Bernhard Enters., 256 Cal. Rptr. 735, 738 (1989); Alonzo v. Chifici, 526 So. 2d 237, 241 (La. Ct. App. 1988) (in applying a "value test" to determine whether the labor expended in constructing the item, or the materials incorporated therein, constitute the principal value of the contract, it is clear that building or construction contracts involve primarily the furnishing of labor and contractual skills).

Material may be either merchandise or supplies depending upon whether it is held for sale or consumed in performing a service. The differences that distinguish a supply material from a merchandise material are determined by context. Thus, the same material in different contexts may be either an inventory item or a supplies item. For instance, although the paper and ink used to prepare blueprints are inventory in the hands of the paper and ink manufacturers, they are supplies in the hands of an architect. See, e.g., sec. 1.263A-2(a)(2)(ii)(B)(2), Income Tax Regs. (the cost of materials used by an architect to prepare blueprints provided to clients may be deducted as an expense because the blueprints are de minimis and incident to the provision of service). This is so even though the architect

purchases the paper and ink from a manufacturer, the architect's sale of services and materials to his or her clients includes the paper and ink, and the clients purchase the blueprints from the architect. The essence of the architect's business is providing the service of designing buildings, not the sale of blueprints. Cf. Knight-Ridder Newspapers, Inc. v. United States, 743 F.2d 781 (11th Cir. 1984) (paper and ink held by newspaper publisher for use in producing newspapers for sale to customers is inventory).

We hold that the inherent nature of petitioner's business is that of a service provider. Accordingly, we must determine whether the materials petitioner uses are an indispensable and inseparable part of rendering its services.

A. The Liquid Concrete

Petitioner relies upon our decision in Galedrige Constr., Inc. v. Commissioner, T.C. Memo. 1997-240, for its argument that the materials are not merchandise. We agree that the rationale of Galedrige applies to the liquid concrete in this case.

In construing the word "merchandise" in Galedrige, we applied the rule that "'the natural and ordinary meaning of the words used will be applied * * * unless the Congress has definitely indicated an intention that they should be otherwise construed'". Wilkinson-Beane, Inc. v. Commissioner, supra at 354 (quoting Huntington Sec. Corp. v. Busey, 112 F.2d 368, 370 (6th Cir. 1940)). In Galedrige Constr., Inc., for the first time,

this Court considered the issue of whether a person in the business of only laying emulsified asphalt sold merchandise or maintained an inventory of emulsified asphalt.[7]

In Galedrige Constr., Inc. it was clear that the taxpayer, an asphalt paving contractor, provided a service to its clients; if its clients had wanted only to purchase emulsified asphalt, they could have done so by dealing directly with the emulsified asphalt supplier. Similarly, in the case at hand, it is clear that petitioner provides service to its clients; if its clients wanted only piles of fill sand, drain rock, liquid concrete, and miscellaneous hardware items, they could obtain them directly from the various suppliers. It is evident that petitioner's clients could order the various materials directly from the

---

[7]In Akers v. Commissioner, T.C. Memo. 1984-208, affd. in part and revd. in part sub nom. Asphalt Prods. Co. v. Commissioner, 796 F.2d 843 (6th Cir. 1986), this Court considered the issue of whether a taxpayer in the business of manufacturing and selling asphalt and asphalt products, who maintained inventories including oil byproducts and other raw materials, in addition to performing some paving work, must account for inventories and use the accrual method of accounting.

In contrast, the taxpayer in Galedrige Constr. Inc. v. Commissioner, T.C. Memo. 1997-240, was not in the business of manufacturing asphalt and maintained no inventory of asphalt, oil byproducts, or other raw materials. Moreover, unlike the taxpayer in Akers who had large tanks in which it was able to preserve the emulsified condition, and therefore the marketable quality, of its finished product, the taxpayer in Galedrige Constr., Inc. was unable to prevent or delay the asphalt from becoming rock hard and worthless within a very few hours.

suppliers by the fact that the clients paid for the various materials separately and specifically with a joint payee check.

From the moment the taxpayer in Galedrige Constr., Inc. received the "emulsified asphalt from the supplier * * * [it] was joined in a race that had an unalterable predetermined outcome; within 2 to 5 hours the emulsified asphalt would be rock hard and worthless." Id. The race was not to sell or to deliver the asphalt to the taxpayer's client; rather, it was to lay the asphalt before time expired and the asphalt changed its physical state into a form that was worthless to the taxpayer; only the liquid state of the emulsified asphalt provided any utility to the taxpayer, and that state expired very quickly.

Consequently, in Galedrige Constr., Inc. v. Commissioner, supra, the only form of the material that provided any value to the taxpayer was "used up" or consumed in providing service to the taxpayer's client. Consumption of a material in the performance of a service or in a manufacturing process is indicative that the material is a supply, not merchandise held for sale. See Osteopathic Med. Oncology & Hematology, P.C. v. Commissioner, 113 T.C. at 385; see also Rev. Rul. 75-407, 1975-2 C.B. 196 (public utility that used the accrual method of accounting should continue to deduct as a supply expense under section 1.162-3, Income Tax Regs., the cost of fuel oil consumed and used to generate electricity distributed to customers during

the taxable year); Rev. Rul. 90-65, 1990-2 C.B. 41 (the cost of unrecovered platinum from prills used in refining petroleum is a material or supply expense allowed under section 1.162-3, Income Tax Regs.). Accordingly, in Galedrige Constr., Inc. v. Commissioner, supra, we held that in the hands of the taxpayer/paving contractor, the emulsified asphalt was a supply, not merchandise.

Similarly, in this case the only form of the concrete that provides utility to petitioner is the liquid or wet form. Also, similar to the emulsified asphalt in Galedrige Constr., Inc. v. Commissioner, supra, the physical state of the concrete changes very quickly from one that provides utility to petitioner, to one that has no value at all.

The ready-mix concrete in this case is practically indistinguishable from the emulsified asphalt material in Galedrige Constr., Inc. Considering the facts of this case (and Galedrige) and the ephemeral quality of the material at issue, only a strained and unconventional interpretation of the word "merchandise" would include liquid concrete (or emulsified asphalt) within its definition.[8]

These materials with their severely limited periods of utility that were ordered specifically for, delivered to, and

---

[8]We here are dealing with the physical laws of the Universe, against which the laws of mere mortals cannot stand.

paid for by the taxpayer's client, cannot in any natural or ordinary sense be considered "held for sale" by the taxpayer. Accordingly, considered in this context, we find that the ready-mix concrete is a supply, not merchandise.

B. The Other Materials

Other materials under consideration in this case--the fill sand, drain rock, and hardware items--do not share the ephemeral physical properties of liquid concrete or the emulsified asphalt in Galedrige Constr., Inc. Rather, they are durable like the replacement parts in Honeywell, Inc. v. Commissioner, T.C. Memo. 1992-453. In Honeywell, Inc. we stated that the purpose for which the property was acquired and held is determinative of whether the property is merchandise within the meaning of section 1.471-1, Income Tax Regs. In Honeywell, Inc., we concluded that, because replacement parts were used by the taxpayer to perform its service contracts, the replacement parts were not acquired and held for sale and those parts were not merchandise within the meaning of the applicable regulation. See id. Moreover, it is apparent that the replacement parts were indispensable and inseparable from the service provided by the taxpayer.

We now conclude that the fill sand, drain rock, and hardware items, like the liquid concrete, were indispensable and inseparable from the service provided by petitioner.

First, the construction material in this case, when combined

with other tangible personal property, lost its separate identity to become an integral and inseparable part of the real property in the construction activity.[9]  Cf. <u>Wilkinson-Beane, Inc. v. Commissioner</u>, 420 F.2d 352, 355 (1st Cir. 1970) (caskets sold as part of undertaking establishment's funeral service retain their separate identity); <u>Thompson Elec., Inc. v. Commissioner</u>, T.C. Memo. 1995-292 (lighting fixtures, which by definition do not lose their separate identity, used with other materials in taxpayer's electrical contracting business).  Thus, the materials in this case are similar to the chemotherapy drugs in <u>Osteopathic Med. Oncology & Hematology, P.C. v. Commissioner</u>, <u>supra</u>, which, though not ephemeral in the sense that their usefulness would disappear if not immediately used, when injected also lost their identity separate from that of the patient.  Materials that lose their separate identity in these circumstances are not merchandise within the meaning of section 1.471-1, Income Tax Regs.; rather, they are supplies consumed in the provision of service that are properly deducted under section 162.

Second, petitioner did not contract to sell materials to its developer clients, and the clients had no interest in purchasing materials from petitioner.  Petitioner's contract with its real

---

[9]We note that the materials suppliers sent the California Preliminary Lien Notices to the developer; the notices provided that if the bill for the materials was not paid in full, a mechanic's lien could be placed against the developer's real property.

property developer clients was for the construction of foundations, driveways, and walkways. Thus, we cannot find that petitioner is a merchant[10] that has acquired "raw materials and supplies" for sale, see sec. 1.471-1, Income Tax Regs., or that holds and sells "goods purchased in condition for sale", Wilkinson-Beane, Inc. v. Commissioner, supra at 354-355.

Third, foundations, driveways, and walkways are improvements to real property. We have held previously that improvements to real property are not merchandise. See Homes by Ayres v. Commissioner, 795 F.2d 832, 835 (9th Cir. 1986) (tract houses are not merchandise), affg. T.C. Memo. 1984-475 (rejecting taxpayer's argument that a homebuilder "manufactures" houses); see also W.C & A.N. Miller Dev. Co. v. Commissioner, 81 T.C. at 630 (developed real property constructed and held for sale is not inventory). Therefore, the foundations, driveways, and walkways are not merchandise, and the materials used in their construction do not "become a part of merchandise intended for sale". See sec.

---

[10]For purposes of accounting, "merchandise" is defined as "Purchased articles of commerce held for sale; the inventory of a merchant." Kohler, Kohler's Dictionary for Accountants 329 (6th ed. 1983). Furthermore, "merchant" is defined as "One who buys and sells articles of commerce without change in their form." Id.

"In its commonly accepted usage, the term 'merchandise' is defined to encompass wares and goods, not realty." W.C. & A.N. Miller Dev. Co. v. Commissioner, 81 T.C. 619, 630 (1983). Furthermore, "real property and the labor, materials and supplies which enter into improving real property, are generally not considered for accounting purposes to be inventoriable." Id.

1.471-1, Income Tax Regs.

Consequently, petitioner is not a manufacturer of merchandise or a merchandising concern, nor engaged otherwise in a "merchandising" activity. Because petitioner does not produce or sell merchandise, petitioner is not engaged in a business activity that requires the maintenance of an inventory. See Homes by Ayres v. Commissioner, supra.

Mr. Martinez, a corporate officer and shareholder of petitioner, testified that the only material left over at the completion of a job is a small pile of sand or gravel. Although Mr. Martinez' testimony may be regarded as self-serving, in this case it is consistent with the objective evidence.

The operation of petitioner's construction activity required it to use most of the materials at the time they were delivered to the construction site. The stipulations and other evidence show that materials required to perform the work were ordered from the suppliers and delivered to the job site, where they were incorporated almost immediately into the real property improvements. Each material supplier sent the real property developer a preliminary lien notice for the materials delivered to the site. Petitioner submitted its invoice and lien releases to the real property developer for the materials used to complete its work at each residential lot. The developer paid for the cost of the materials that had been used in completing the

improvements by checks made out to each supplier and petitioner as joint payees, which petitioner forwarded to each material supplier. The joint checks were not deposited in petitioner's bank account.

Therefore, the materials were used up before petitioner sent its invoice and the lien releases for the completed work to the developer, before the developer paid for the materials, and before petitioner recorded the materials expense.

Respondent makes much of the fact that, unlike the concrete, small amounts of some of the materials may have been left over after the job. Respondent argues that these materials could have been loaded onto petitioner's truck and moved to another job site or stored in its equipment yard. It is clear from the facts that no concrete was left over, and any leftover sand or gravel was abandoned onsite upon the completion of each job, as the expense of moving it would have exceeded its cost; moreover, only an insignificant amount of any of the other material could have been left over. Cf. J.P. Sheahan Associates, Inc. v. Commissioner, T.C. Memo. 1992-239 (roofing materials and supplies remaining at the close of a job are returned to the supplier for credit).

The parties stipulated that petitioner kept some of the hardware items in the storage container at its place of business. Since the total cost of all the hardware items was approximately 5 percent of the total cost of a typical contract, and all the

materials were delivered to the developer's site, any amount kept on hand at the equipment yard had to be insignificant.

Petitioner's possession of a de minimis amount of material would not be sufficient to require it to use the accrual method of accounting for inventories.  See Osteopathic Med. Oncology & Hematology, P.C. v. Commissioner, supra at 113 T.C. at 387 (taxpayer that had 2 weeks' supply of chemotherapy drugs on hand not required to use inventory method of accounting); Honeywell, Inc. v. Commissioner, supra (taxpayer not required to use inventory method of accounting for computer replacement parts that were stored on taxpayer's premises and represented 11 and 12 percent of income, even though taxpayer transferred title to the replacement parts to the customer); see also Tech. Adv. Mem. 98-48-001 (July 16, 1998) (taxpayer that purchases and sells merchandise not required to maintain inventories because the purchase and sale of the merchandise was de minimis and not an income-producing factor within the meaning of section 1.471, Income Tax Regs.; therefore, taxpayer may continue to account for these merchandise items on the cash basis); G.C.M. 38,288 (Feb. 21, 1980) (the IRS may allow the use of the cash method of accounting despite the fact that the taxpayer may furnish some tangible product in the course of rendering a service, a reconsideration of Rev. Rul. 74-279, 1974-1 C.B. 110).
We decline to attach significance to the fact that in calculating

its bid, petitioner used the total cost of labor and materials as a basis to calculate the value of its service.

In calculating its potential profit, petitioner had to consider the complexity of the work, and, therefore, its potential for loss in case of errors. For instance, contracts for construction projects that use a greater amount of concrete and other materials, or involve curved rather than straight lines, are more difficult to perform. The quantity of the material used was another factor in this estimation. The consideration of such costs, however, does not dictate the classification of the material as inventory. See Osteopathic Med. Oncology & Hematology, P.C. v. Commissioner, supra; Honeywell, Inc. v. Commissioner, supra. That petitioner used the total cost of labor and materials as a base to calculate the project profit does not mean that petitioner sold merchandise to its clients.

We have found that petitioner's contracts with its real property developer clients are service contracts, that the material provided by petitioner is indispensable to and inseparable from the provision of that service, that the materials lost their separate identity to become part of the real property in the construction activity, and that, in substance, no sale of merchandise occurred between petitioner and its clients. The bottom line is that petitioner did not hold merchandise for

sale, and there simply was no sale of merchandise between petitioner and its clients. See Osteopathic Med. Oncology & Hematology, P.C. v. Commissioner, supra; Honeywell, Inc. v. Commissioner, supra.

C. Income-Producing Factor

Respondent may require petitioner to use an inventory method of accounting only if we find each of the following as facts: (1) Petitioner produced, purchased, or sold merchandise, and (2) petitioner's production, purchase, or sale of that merchandise was an income-producing factor. See Osteopathic Med. Oncology & Hematology, P.C. v. Commissioner, supra; Honeywell, Inc. v. Commissioner, supra. Section 1.471-1, Income Tax Regs., does not provide that any material that is an income-producing factor is ipso facto merchandise. We have found that petitioner does not produce, purchase, or sell merchandise; therefore, whether the material is an income-producing factor is irrelevant. See Osteopathic Med. Oncology & Hematology, P.C. v. Commissioner, supra.

Accordingly, we find that petitioner is not required to use an inventory method of accounting.

Issue 2. Whether Respondent Abused His Discretion in Determining That Petitioner's Use of the Cash Method of Accounting Did Not Clearly Reflect Its Income

"'The cash method of accounting has been widely used throughout the contracting industry and accepted by respondent

since time immemorial.'" <u>Ansley-Sheppard-Burgess Co. v. Commissioner</u>, 104 T.C. 367, 375 (1995) (quoting <u>Magnon v. Commissioner</u>, 73 T.C. 980, 1004 (1980)); see also <u>Magnon v. Commissioner</u>, <u>supra</u> at 1004-1006 (use of cash method of accounting by electrical contractor held to clearly reflect income); <u>National Builders, Inc. v. Commissioner</u>, 12 T.C. 852, 858-859 (1949) (Court reviewed) (Court found that cash method of accounting clearly reflected taxpayer's income and rejected Commissioner's determination that construction contractor use hybrid method of accounting instead of cash method); <u>C.A. Hunt Engg. Co. v. Commissioner</u>, T.C. Memo. 1956-248 (use of the cash method of receipts and disbursements held to reflect income clearly). Thus, it is clear that the construction industry practice of using the cash method of accounting has long been accepted by this Court.

Respondent argues that petitioner must use an inventory method of accounting to clearly reflect its income because it sells merchandise. We have found that the materials used by petitioner are not merchandise. Respondent did not assert that petitioner attempted to unreasonably prepay expenses or purchase supplies in advance, and the evidence shows the contrary.[11] See

---

[11]Petitioner received the invoices from the suppliers within 30 days of the delivery of the materials to the developer's construction site. Petitioner also received within 30 days of the provision of its services a check from the developer, made to petitioner and the supplier as joint payees, for payment of the

Ansley-Sheppard-Burgess Co. v. Commissioner, supra at 374; Van

Raden v. Commissioner, 71 T.C. 1083, 1104 (1979), affd. 650 F.2d

1046 (9th Cir. 1981).

It is irrelevant that the amount of taxable income that

petitioner reported using the cash method of accounting is not

the same amount that it would have reported if it used the

accrual method.  We previously have held that where a taxpayer is

a "small" corporation permitted to use the cash method under

section 448(b)(3),[12] is not required to maintain an inventory,

invoices, which petitioner forwarded to the supplier.  Under the
cash method of accounting, petitioner deducted the cost of the
expense of the already consumed materials when paid, and recorded
as income the payment when received.  Thus, petitioner's method
of accounting matched the receipt of the payment for the material
with the deduction for the expense.  Cf. Knight-Ridder
Newspapers, Inc. v. United States, 743 F.2d 781, 792 (11th Cir.
1984) (inventories of paper and ink deducted at time of purchase,
rather than at time of use);  Wilkinson-Beane, Inc. v.
Commissioner, 420 F.2d 352, 353-354 (1st Cir. 1970), affg. T.C.
Memo. 1969-79 (cost of caskets held for long periods of time,
some for more than one year, deducted during year in which
taxpayer paid for them); J.P. Sheahan Associates, Inc. v.
Commissioner, T.C. Memo. 1992-239 (cost of material deducted in
year of purchase, not at time of use).  Therefore, we cannot find
that petitioner accounted for the cost of the materials
incorrectly.

[12]Sec. 448 provides in pertinent part:

SEC. 448.  LIMITATIONS ON USE OF CASH METHOD OF ACCOUNTING.

(a) General Rule.--Except as otherwise provided in this
section, in the case of a--
    (1) C corporation,
    (2) partnership which has a C corporation as a partner,
or
    (3) tax shelter,
taxable income shall not be computed under the cash receipts

consistently used the cash method of accounting since its

incorporation, and has made no attempt to unreasonably prepay

expenses or purchase supplies in advance, the taxpayer is not

required to show a substantial identity of results between the

taxpayer's method of accounting and the method selected by the

Commissioner.  See Ansley-Sheppard-Burgess Co. v. Commissioner,

_____

and disbursements method of accounting.

(b) Exceptions.--

          *     *     *     *     *     *     *     *

     (3) Entities With Gross Receipts of Not More Than
$5,000,000.--Paragraphs (1) and (2) of subsection (a) shall
not apply to any corporation or partnership for any taxable
year if, for all prior taxable years beginning after
December 31, 1985, such entity (or any predecessor) met the
$5,000,000 gross receipts test of subsection (c).

(c) $5,000,000 Gross Receipts Test.--For purposes of this
section--
     (1) In General.--A corporation or partnership meets the
$5,000,000 gross receipts test of this subsection for any
prior taxable year if the average annual gross receipts of
such entity for the 3-taxable-year period ending with such
prior taxable year does not exceed $5,000,000.

          *     *     *     *     *     *     *

     (3) Special Rules.--For purposes of this subsection--

     (A) Not In Existence For The Entire 3-Year Period.--If
the entity was not in existence for the entire 3-year period
referred to in paragraph (1), such paragraph shall be
applied on the basis of the period during which such entity
(or trade or business) was in existence.

<u>supra</u> at 377.[13]

It is clear from petitioner's billing procedure and the operation of its construction activity that the materials were used up before they were paid for by the developer and before petitioner reported their expense.  Therefore, petitioner had no opportunity to report as an expense any materials that may have been delivered to a job site before the close of its taxable year but not yet used.

As was the case in <u>Osteopathic Med. Oncology & Hematology, P.C. v. Commissioner</u>, <u>supra</u>, the notice of deficiency is worded broadly as to the specific basis for respondent's determination that the cash method does not clearly reflect petitioner's

---

[13]According to the typical bid worksheet, the only factors in petitioner's income are materials, labor, and profit.  On the worksheet the total materials cost is $927.39, and the labor cost is $477.  Therefore, typically the cost of labor as a percentage of the total materials cost is 51.46 percent.

The total cost of all items purchased in the taxable year at issue was $993,777.  Thus, the associated labor cost may be estimated as approximately $511,360.  The sum of these amounts is $1,505,137.  Petitioner received $1,564,045 in gross receipts for the year at issue and reported $64,806 as taxable income.  The difference between the gross receipts and the sum of the materials and the approximate cost of labor is $58,908; this amount is very close to the amount petitioner reported as income.

The profit percentage varied depending on the job, but it was usually between 10 and 20 percent.  The difference between the amount of income as calculated above and the amount reported by petitioner is probably attributable to the different profit percentages charged by petitioner for jobs of different levels of complexity.  Thus, the "typical" profit of 15 percent is a rough average of the various profit percentages actually charged.

Therefore, petitioner's method of accounting clearly reflected the amounts that it actually received and the actual costs incurred to perform the work.

income.  However, in his answer and on brief respondent argues only that this is so because petitioner sells merchandise that must be inventoried.  We have held that petitioner does not sell merchandise.  Consequently, we need not and do not engage in further analysis of the clear reflection of income standard of section 446.  See id.

In light of the above, we hold that respondent's determination that petitioner's method of accounting did not produce a clear reflection of income was an abuse of discretion.

We have considered all arguments in this case for a contrary holding and, to the extent not discussed above, find those arguments to be without merit or irrelevant.  To reflect the foregoing,

<u>Decision will be entered for petitioner</u>.

Reviewed by the Court.

CHABOT, WELLS, WHALEN, COLVIN, BEGHE, LARO, FOLEY, VASQUEZ, and GALE, <u>JJ</u>., agree with this majority opinion.

MARVEL, <u>J</u>., dissents.

GERBER, J., dissenting: I respectfully disagree with the majority's conclusions that petitioner was not selling merchandise and that respondent abused his discretion by determining that petitioner's use of the cash method did not clearly reflect income. I disagree for the following reasons: (1) Petitioner did not meet its heavier-than-normal burden of showing an abuse of respondent's discretion; (2) the majority's conclusion that the materials involved are merely an inseparable part of petitioner's performance of a service is not supported by the record; (3) the majority's holding and approach may result in unintended preferential Federal tax treatment for a particular industry and/or taxpayers dealing in so-called "ephemeral" products or materials; (4) the holding in Galedrige Constr., Inc. v. Commissioner, T.C. Memo. 1997-240, is in error, and, accordingly, the majority's reliance upon it is unfounded; and (5) this case is factually distinguishable from Osteopathic Med. Oncology & Hematology, P.C. v. Commissioner, 113 T.C. 376 (1999).

The majority sets forth the correct standards for determining whether respondent has abused his discretion. Those standards are summarized here to emphasize that petitioner has failed to meet the standard expressed by the majority: The Commissioner has broad authority to decide whether a taxpayer's accounting method clearly reflects income. We need only decide whether there is adequate basis in law for the Commissioner's conclusion, and section 446 imposes a heavy burden on the

taxpayer to show otherwise. "[A] taxpayer "must establish that the Commissioner's determination was 'clearly unlawful' or 'plainly arbitrary'." Majority op. p. 14 (quoting Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532-533 (1979)) (emphasis added).

Respondent determined that "[petitioner's] current method of accounting (cash), is an improper method and * * * changed * * * [petitioner] to an accrual method. This change has resulted in an increase in * * * [petitioner's] gross receipts." Respondent also determined, in the alternative, that "under the cash method of accounting, * * * [petitioner's] income is increased for failure to properly substantiate * * * [petitioner's] accounts receivable." The majority, however, limits the issue to the question of whether the material used by petitioner in performing its service contracts is the sale of "merchandise" for purposes of section 1.471-1, Income Tax Regs. Majority op. p. 12. The majority incorrectly expresses respondent's notice determination in the following manner: "Respondent determined that the material petitioner used in its construction activity was merchandise that was income producing, and, therefore, petitioner must use the accrual method of accounting to clearly reflect its income." Majority op. p. 15. The majority has treated respondent's response to petitioner's argument as respondent's determination. Respondent's arguments on brief were in response to petitioner's position that it should not be placed on the

accrual method because it was in a service business and because it had no inventories. The majority's limited focus represents only a portion of the standard to be considered in order to decide this issue. Petitioner's burden (heavier than normal) is to show that respondent's determination is in error; i.e., that respondent abused his discretion by determining that petitioner's method does not clearly reflect income. Petitioner cannot carry that burden by the simple expedient of contending that the materials it uses to produce finished sidewalks, driveways, and foundations should be labeled as supplies consumed. It must also show that its method of accounting clearly reflected income and that respondent's determination was clearly unlawful or plainly arbitrary. Based on the facts of this case, petitioner has failed to carry its burden.

Ultimate Factual Conclusions by the Majority[1]

The majority attempts to persuade us that the materials used by petitioner, which represented two-thirds of the total cost, were incidental to and absorbed in the performance of services (labor), which represented one-third of the cost. The majority

---

[1] As the trial Judge (finder of fact) in a factually oriented case, I am placed in the difficult and unpleasant position of providing, in the context of a dissenting opinion, my factual perspective. Two critical factual inquiries are presented by the issues: (1) Whether petitioner has shown that respondent abused his discretion, and (2) whether petitioner produced or sold merchandise and/or had ending inventory. I disagree with the majority's ultimate findings of fact, and, to some degree, the standard employed. Each of these matters is separately addressed in this dissent.

focuses upon the wet concrete and unincorported materials.
However, the record, when considered in its entirety, supports
the conclusion that petitioner contracted to produce a finished
product (sidewalks, driveways, and foundations). Equally
important, petitioner has not shown the amounts of materials
and/or work in progress that remained on hand at the end of the
taxable period. Nor has petitioner shown that its accounting
method clearly reflected income. The majority accepts
petitioner's conjectural, uncorroborated, and admittedly "self-
serving" statement that there were little materials left when a
job was completed. Even if that statement is correct,
petitioner's taxable period did not necessarily or likely end at
the exact time petitioner's job(s) ended. Therefore, petitioner
has failed to show the amount of materials on hand at the close
of the taxable year. The majority uses conjecture and draws
inferences from the record to reach the conclusion that there was
no inventory on hand and/or that it would not have had a material
effect on petitioner's income. Such an approach falls far short
of the showing that an inventoriable amount of materials was or
was not on hand at the close of its taxable year.

The majority paints an image in which petitioner could be
viewed as merely providing a service and consuming concrete and
supplies incidental to providing that service. Although the
record does confirm that petitioner is in a service-oriented
business, the overwhelming weight of the evidence shows that

petitioner produced a product (sidewalks, driveways, and foundations). The majority myopically focuses on the wet concrete and not on the end product that petitioner produced. Significantly, that product was completed with materials purchased by petitioner and accepted by the customer in completed form before petitioner was entitled to payment. Until such time as the customer/developer accepted the finished product, petitioner was at risk and responsible for the construction, placement, and quality of the product. Finally, it is significant that petitioner's profit percentage (about 15 percent) was marked up on both materials (including concrete) and labor.

The majority also attempts to minimize the possible effect on petitioner's income of the purchase and storage of sand, gravel, re-bar, anchor bolts and rods, expansion anchors, holddowns, straps, and piping for sewer and drainage (other materials) used in producing the final product (sidewalks, driveways, and foundations). It is my understanding of the facts that only concrete suppliers were involved in asserting their liens and were paid by a separate check from the developer through petitioner in order to ensure that any suppliers' liens were satisfied. Even if a separate check was issued by the developer to petitioner and the supplier jointly, petitioner had the contractual relationship with all suppliers and claimed the concrete and all other materials as cost of goods sold. In

either event, there is no specific evidence that the suppliers of sand, gravel, re-bar, anchor bolts and rods, expansion anchors, holddowns, straps, and piping for sewer and drainage were paid by a separate check from the developer. To the contrary, sand and gravel were ordered periodically and delivered to the job site and used over a period of time. The record also confirms that re-bar, anchor bolts and rods, expansion anchors, holddowns, straps, and piping for sewer and drainage were periodically ordered in bulk and taken as needed from a standing supply that was maintained in a large metal storage container at petitioner's place of business and transported to job sites on a regular basis. Petitioner did not show the amount of sand and gravel at job locations as of the end of the taxable period. Nor did petitioner show the amount of other materials stored in the metal container or at the job site as of the end of the taxable period. In addition, petitioner had work in progress (finished concrete structures) for which components were deducted, but the final payment may not have been received. Again, petitioner made no showing of the amount or status of paid-for materials contained in work in progress at the close of its taxable year.

The majority also attempts to show that the amount of sand and gravel and other materials on hand at the end of the taxable year was de minimis by surmising that the percentage cost of those items reflected in the final product was smaller than the percentage of labor or concrete. But that in no way shows the

amount that petitioner may have had on hand at the end of the taxable period. The invoices for the sand and gravel and other materials show periodic purchases in the tens of thousands of dollars. Accordingly, sufficiently large quantities of these items may have been on hand at any particular time, including the end of the taxable year. Petitioner was constructing foundations, sidewalks, and driveways in large subdivisions, so it is likely that at any particular time petitioner maintained a relatively large quantity of sand and gravel at the job site. Petitioner has provided no specific evidence as to the amount of these items on hand or that they were, in fact, without a significant effect on the amount of income that would have been reported under the accrual method. The majority accepts, without any corroboration, testimony that the amount of sand and gravel on hand was small. Petitioner, however, kept no records of the inventory of sand, gravel, and other materials on hand and was not able to show the amount of materials on hand. Considering the heavy burden imposed here, a taxpayer should not be able to show that respondent's determination was arbitrary by the simple expedient of stating that any difference in accounting method is "small". Petitioner paid the suppliers for these items, and accordingly they were contained in petitioner's "cost of goods sold" shown on the return. It should also be noted that petitioner included the cost of the concrete in its cost of goods sold and that hardened concrete existed in the form of work in

progress. In that regard, petitioner did not show that amounts claimed in cost of goods sold did not represent poured/hardened concrete for which the profit/income had not yet been received/reported.

It must also be emphasized that petitioner decided which concrete supplier to use and had contractual relationships with particular suppliers. It was petitioner who placed orders and accepted delivery of the concrete at the job site. Although the developer's agent was occasionally on the job site for inspection of the concrete, petitioner bore the risk of loss from a substandard or misplaced concrete order. Petitioner had the right under its contract with the concrete supplier to refuse delivery of substandard concrete, and, under normal conditions, it was petitioner who was present at and controlled the pouring of concrete into the forms. Finally, petitioner took possession of the concrete at the time it was being poured and likely held title to the concrete under California law.

The majority labels petitioner's contractual relationship with the developer as one for services, but that same contract contains the specifications for the final product that petitioner was obligated to produce. Other portions of the contract set forth the materials that petitioner must provide and include in the finished product. It is important to note that we are not presented with a situation where the developer purchases materials and the contractor simply provides labor and incidental

supplies; i.e., a contractor who is hired solely to supervise the pour and/or finish the concrete. The contract and other facts in the record reflect an agreement for the delivery of a finished product. The total cost of the product, two-thirds of which was composed of materials, was marked up with a 15-percent profit. Finally, the developer could reject the finished product, and petitioner would have had to bear the cost of removing the solidified concrete, which includes the re-bar, bolts, and other materials ("hardware items").

Based on the record, I reach the ultimate conclusion that petitioner was engaged in producing and selling sidewalks, driveways, and foundations. Petitioner did not merely provide a service and consume the concrete, sand, re-bar, bolts, plates, pipes, etc., in providing the service. To so find would stretch the majority's analogy to architects and blueprint ink "to infinity and beyond." Finally, the value of the materials used far outweighed the value of the services by a 2 to 1 ratio (66 percent materials vs. 34 percent labor). At the close of petitioner's taxable year, it had on hand materials that had been paid for and were accordingly included in cost of goods sold in the form of: "Hardware" (re-bar, anchor bolts and rods, expansion anchors, holddowns, straps, and piping for sewer and drainage); sand and gravel in place at existing job sites; and work in progress (including finished sidewalks, driveways, and foundations composed of purchased materials, which had not been

accepted by the developer/customer and, accordingly, for which income was not reported). All of those items may have had a significant effect on petitioner's reportable taxable income. Again, petitioner has not shown the amount of materials on hand or work in progress as of the end of the taxable year under consideration.[2]

Petitioner, at the end of its very first year in existence, had accounts receivable of $294,436 on accrual method gross receipts of $1,798,338; i.e., 16.4 percent of its receipts were unreported at the end of its taxable year. Moreover, the accounts receivable of $294,436 was 18.8 percent of the reported gross receipts, under the cash method, of $1,564,045. If the taxable income reported by petitioner included the receivables under the accrual method of income, petitioner would have reported taxable income of $267,428. Petitioner claimed cost of goods sold in the amount of $993,777, which resulted in taxable income on the cash method of $64,806. Any reduction in cost of goods sold, of course, would increase income. In spite of these

---

[2] The existence of $294,436 in accounts receivable at the end of petitioner's very first taxable year may indicate that petitioner had a substantial amount of completed work and work in progress for which it had not been paid, but for which it had deducted the cost of materials. Under the cash method, the accounts receivable and work in progress for which payment has not been received are not included in gross receipts. A mismatch thus occurs by the overstatement of deductions for materials under the cash method. In this case, the mismatch is potentially large considering that the accounts receivable represent a large percentage of the gross receipts for the tax year under consideration.

disparities, the majority did not address the question of substantial identity of results.  See majority op. p. 37.

Petitioner's failure to show that any of the above-discussed factors or items would not have made a difference in petitioner's cost of goods sold or income, ultimately, should result in our holding that petitioner failed to show that respondent abused his discretion in determining that petitioner's use of the cash method did not clearly reflect income.  In the vernacular used by the majority, petitioner has not shown that respondent's determination was "plainly arbitrary".[3]  Majority op. p. 14.  We next consider whether petitioner has shown that respondent's determination was "clearly unlawful".  Id.

Legal Discussion

The majority's legal discussion is broken into two major categories involving whether the sidewalks, driveways, and foundations were merchandise and whether respondent abused his discretion.  Each is separately addressed.

(1) Whether the Materials Used or the Structures Constructed by Petitioner Were Merchandise

Normally, in cases where respondent determines that a taxpayer's accounting method should be changed to the accrual method, the controversy concerns whether the merchandise is a material income-producing factor and whether the accrual or cash

---

[3] Even if the facts equally supported both parties' positions, petitioner necessarily fails to meet the heavy burden imposed.

method of accounting more clearly reflects income. Respondent has determined that petitioner should use the accrual method, and, accordingly, petitioner must show that there has been an abuse of discretion by addressing the above-referenced factors. Petitioner, relying on Galedrige Constr., Inc. v. Commissioner, T.C. Memo. 1997-240, attempts to lessen its burden by attempting to show that the materials used and the objects constructed are not merchandise and are instead supplies consumed in performing a service.

Following petitioner's lead, the majority holds that neither the materials nor the constructed products constitute merchandise. In support of the holding that the materials used and the products completed by petitioner are not merchandise, the majority relies on the following: (a) Petitioner is primarily a service provider (a fact that is not supported by the record when viewed as a whole); (b) there is no established definition for the terms "inventory" or "merchandise"; (c) in order for items to be "merchandise" they must be goods held for sale; (d) case law holds that, per se, construction contracts are contracts for the provision of services as opposed to the sale of goods; (e) liquid concrete cannot be merchandise because it hardens in a short period of time; i.e., is ephemeral in nature and must, therefore, be consumed in the performance of a service; (f) the sand, gravel, re-bar, anchor bolts and rods, expansion anchors, holddowns, straps, and piping for sewer and drainage lose their

separate identity, become part of the hardened concrete, and are thus "indispensable and inseparable from the service provided by the taxpayer", majority op. p. 27; (g) driveways and walkways are improvements to real property and, ipso facto, cannot be merchandise.  Because of the majority's conclusion that the materials that went into the product (sidewalks, driveways, and foundations) were not merchandise, the majority does not discuss whether they were material income-producing factors.

A full and complete analysis of the record does not support the majority's ultimate finding of fact that the materials and products were merely supplies consumed in petitioner's performance of a service for customers.  Likewise, an analysis of established precedent of this Court leads to the conclusion that petitioner has not carried its burden of showing:  That the materials and/or finished product were not material income-producing factors; that the cash method of accounting more clearly reflects income; and, ultimately, that respondent abused his discretion by determining that petitioner should change to the accrual method.

(a) Petitioner's Business Is Not Primarily Providing a Service--To be sure, petitioner is engaged in a labor-intensive activity.  Generally, the construction industry is considered to be service oriented.  Most businesses, however, have some element

of labor or service and some element of merchandise or product.[4]
See, e.g., Thompson Elec., Inc. v. Commissioner, T.C. Memo. 1995-
292, where the taxpayer, an electrical contractor, used materials
such as wiring, conduits, electrical panels, and lighting
fixtures in its contracting business.  The question that must be
considered is:  "At what point do the materials become an income-
producing factor?"  The taxpayer in Thompson Elec., Inc.,
maintained on its premises an inventory of unassigned materials
that were used for small contracts and, in addition, delivered
materials directly from the supplier to its large-contract
customers' sites.  In Thompson Elec., Inc., it was held that
those materials were merchandise that was an income-producing
factor even though:  The taxpayer did not display the material to
customers or to the public, the material was not itemized on bids
or invoices nor separately charged to the customer, the taxpayer
did not sell material separately from its services, and the
taxpayer's customers generally did not select the materials to be
used.

As in Thompson Elec., Inc., petitioner is a contractor but
is in the business of constructing concrete sidewalks, driveways,
and related structures.  Petitioner makes bids and then contracts

---

[4] The majority contends that the substantiality of the
materials or product is irrelevant to the question of whether or
not such items are merchandise.  At least two cases, however,
have given weight to the proportion of such items to service.
See Wilkinson-Beane, Inc. v. Commissioner, 420 F.2d 352, 355 (1st
Cir. 1970), affg. T.C. Memo. 1969-79; Thompson Elec., Inc. v.
Commissioner, T.C. Memo. 1995-292.

with developers to construct a finished structure or product. Petitioner purchases concrete, sand, gravel, re-bar, anchor bolts and rods, expansion anchors, holddowns, straps, and piping for sewer and drainage and uses those materials to produce sidewalks, driveways, and foundations. The developer, who does not have any contractual relationship with the suppliers of concrete, sand, gravel, and other materials, must accept the finished product before petitioner is entitled to payment. The materials represent approximately two-thirds of the cost of the finished product and the labor approximately one-third. Petitioner is financially responsible for any deficiencies in the contract specifications up until the acceptance of the finished product by the developer. At any particular time, petitioner has on hand sand, gravel, re-bar, anchor bolts and rods, expansion anchors, holddowns, straps, and piping for sewer and drainage stored at various sites, including its place of business.

When all of these facts are taken into consideration, it becomes evident that petitioner is not solely engaged in providing labor and that the materials are not merely consumed in providing a service. If, however, petitioner had contracted to set forms, pour and finish concrete for a developer who purchased the sand, gravel, concrete, re-bar, anchor bolts and rods, expansion anchors, holddowns, straps, and piping for sewer and drainage, the majority's finding or holding would then ring truer. Instead, the facts in this case are difficult to

distinguish from those set forth in <u>Thompson Elec., Inc.</u>

(b) <u>The Majority's Use of the Terms "Merchandise",</u> <u>"Inventory", and "Goods Held for Sale"</u>--Although the terms "merchandise" and "inventory" are not specifically defined in the tax law, it is fair to say that those terms are broadly used in the pertinent statutes and regulations. Petitioner's contractual relationships involve large residential construction projects, and, at any particular time, petitioner has work in progress (including placed sand, gravel, re-bar, anchor bolts and rods, expansion anchors, holddowns, straps, piping for sewer and drainage, and finished sidewalks, driveways, and foundations that the developer has not yet accepted). Petitioner also purchases materials that remain on hand and in place at the end of its taxable year. I disagree with the majority's holding based on petitioner's uncorroborated statements and argument that there was no inventory on hand or that it was not producing merchandise.

The majority also makes a distinction that is at odds with existing case law by holding that merchandise/inventory must be "property that is held for sale, not simply property that is sold." Majority op. p. 17. Implicit in the majority's statement is that goods do not become merchandise or inventory if they are not "held" for some period of time. The only difference one might glean from the majority's distinction is that the purchased items must be "held" for some period of time for sale to

customers.  That statement is contrary to existing case law.  It is well established that the length of time the goods are held does not have a bearing on whether they are merchandise/ inventory.

Even if the taxpayer possessed title to the goods for an instant, it is sufficient to require a taxpayer to inventory the goods as the stock in trade.  See Addison Distrib., Inc. v. Commissioner, T.C. Memo. 1998-289; Middlebrooks v. Commissioner T.C. Memo. 1975-275.  In Addison Distrib., Inc., the taxpayer had electronic materials for a very short period (for inspection purposes), and then it forwarded the materials to the customer. In Addison Distrib., Inc., it was held that the taxpayer should be required to account for inventory and be on the accrual method even though it appeared unlikely that there would be any inventory on hand at the end of an accounting period.  In another case involving a taxpayer in the construction industry, it was held that inventories were required, and the accrual method should be used even though the materials were shipped directly to job sites, and no substantial amounts of materials were inventoried at the taxpayer's warehouse.  See Tebarco Mechanical Corp. v. Commissioner, T.C. Memo. 1997-311 (involving a plumbing, heating, and air-conditioning contractor who was generally involved in commercial construction projects).

Considering the above-cited cases, it is hard to understand the majority's point or distinction in emphasizing that inventory

and/or merchandise must be held for sale in addition to being merely sold. There is no question here that petitioner contracted to purchase the concrete, sand, gravel, concrete, re-bar, anchor bolts and rods, expansion anchors, holddowns, straps, and piping for sewer and drainage. Some of those items were inventoried at petitioner's place of business, some were stored at the customer's job site (sand and gravel). The concrete, however, was ordered by petitioner in a contract relationship between petitioner and a supplier. Petitioner controlled the ordering of the concrete, its time of delivery, pouring, and placement. Finally, although the concrete hardened in place, petitioner remained responsible for any risk of loss until the developer/customer accepted the finished product.

By way of analogy, some contractors precast and sell large concrete structures that are transported from the contractors' place of business to the buyers' job sites. Would the majority hold that such a precast product is not merchandise? Should the place of casting the concrete dictate a taxpayer's choice of accounting method? In either case, the contractor is purchasing the materials, casting the concrete shape (incorporating the so-called hardware), then marking up the material and labor, and selling it to the end user. Should there be a difference between contractors who provide electrical, plumbing, heating, air conditioning services and/or materials and those who provide other structural components (e.g., concrete)?

The majority cites several nontax cases for the proposition that construction contracts are, per se, contracts for labor and not contracts for the sale of goods. Considering Thompson Elec., Inc. v. Commissioner, T.C. Memo. 1995-292, Tebarco Mechanical Corp. v. Commissioner, supra, and related cases, it has made no difference for Federal income tax purposes that the taxpayers were involved in construction or a service-oriented business. The more important question (which the majority has not addressed) is whether the items here were income-producing factors. Indeed, the answer to the question of whether taxpayers should maintain inventories and be placed on the accrual method of accounting should not be different depending upon which industry we are considering. It must be noted that two-thirds of petitioner's profit in this business are attributable to the materials and only one-third to services or labor.

We consider these factual issues on an ad hoc basis. If, as a matter of tax law, particular taxpayers fall within the ambit of a regulation requiring the use of the inventory method and/or the accrual method of accounting, they should not be exempted because of State case or statutory law, especially if other similarly situated Federal taxpayers must otherwise comply with the same rules under the same circumstances.

To the extent that the majority relies on cases that hold that an accretion to real property is not the sale of goods, those holdings should be given no more credibility than contract

case law.  After all, on numerous occasions this Court has been confronted with the question of whether realty was held for sale or investment.  If real property is held primarily for sale in the ordinary course of a trade or business, gain from its sale is ordinary income as opposed to capital gain.  See Eline Realty Co. v. Commissioner, 35 T.C. 1 (1960); Phillips v. Commissioner, 24 T.C. 435 (1955).  In other words, taxpayers have been found to be in the business of selling houses.  The costs of materials used in the construction of houses are not deductible expenses, but rather they are included in the basis of the home and give rise to ordinary income or capital gain upon sale.  The present situation is analogous and should be accounted for in the same manner; i.e., petitioner should not be allowed to deduct expenses prior to reporting income.  Thus, while it is true that real property is not considered merchandise or inventoriable in the same sense that personal property is, the method of accounting for the sale of real property, by way of analogy, reflects that the material and products remaining on hand or contained in work in progress should be considered inventory and/or their costs subtracted from petitioner's cost of goods sold.

Finally, the majority cites Levine v. State Bd. of Equalization, 299 P.2d 738 (Cal. App. 2d 1956), a sales tax case, to support its holding/finding that petitioner is a service business and the materials that go into making concrete structures are not merchandise.  Although it is irrelevant to the

question of Federal taxation, petitioner passed on the charges for sales tax on all materials that were used in making the walkways and driveways.  No sales tax was charged on the labor. The costs of the product sold included about two-thirds materials and one-third labor.  More importantly, we cannot consider the Federal laws as being subservient to or dependent upon State sales tax statutes.  That would likely cause differing results depending on the sales tax law and rulings in each State. Although we might look to State law to determine the ownership of property, we must apply the Federal tax statutes uniformly in accord with our mandate.

(c) Galedrige Constr., Inc. v. Commissioner, T.C. Memo. 1997-240, Should Not Be Applied in This Case and Is Incorrect as a Matter of Law--Galedrige Constr., Inc., is relied on by petitioner and is foundational to the majority's conclusion that liquid concrete is "the only form of the material that provided any value to * * * [petitioner, and it is] 'used up' or consumed in providing service to the * * * [petitioner's] client." Majority op. p. 25.  From that premise, the majority reaches the ultimate conclusion that the material has been consumed in the performance of a service and that it is a supply and not merchandise held for sale.[5]  Assuming, arguendo, that Galedrige

---

[5] For purposes of comparison, the parties in this case stipulated that the lumber that was used to construct the forms and was removed from the final product and sometimes reused was a supply and not merchandise.  We note that the lumber constituted approximately 1 percent of the cost of the materials.

<u>Constr., Inc.</u>, is correct as a matter of law, it should not be applied in the setting of this case.

Here again, the focus of the majority is too limited.  If petitioner had been hired merely to provide the service of overseeing the pouring of liquid concrete and/or finishing semi-hardened concrete, the majority's conclusion would have a more rational and sounder basis.  Those, however, are not the facts of this case.  As more fully explained, <u>supra</u>, petitioner entered into a contract to construct sidewalks, driveways, and foundations to certain specifications.  At the end of petitioner's performance of labor (which represents about 34 percent of the total costs) the materials had not been "consumed" or "used up".  Indeed, the materials had been constructed into the very item (product) that petitioner contracted to construct.  At that point, legal principles may hold that the sidewalks or driveways then belonged to the owner of the real property, but they most certainly had not been consumed or used up in the performance of a service.

The holding in <u>Galedrige Constr., Inc.</u>, is not in accord with established case precedent.  That holding is that "the ephemeral quality of the emulsified asphalt bars its inclusion in the class of goods or commodities held for sale as 'merchandise'".  The <u>Galedrige Constr., Inc.</u>, holding is premised on the fact that something that will lose value in a short time or will be difficult to "inventory" cannot be merchandise or

inventory.  No other reasoning is offered or appears obvious for such a holding, and no prior case discussed this premise.  That holding appears to be in conflict with the Court of Appeals for the Eleventh Circuit's holding in Knight-Ridder Newspapers, Inc. v. United States, 743 F.2d 781 (11th Cir. 1984).  In that case, the court held that, even though the taxpayer sold an extremely perishable commodity and had no inventory of finished goods, the taxpayer was required to account for inventories because newspapers were merchandise, and there was a significant fluctuation of newsprint and ink on hand.  By way of comparison, a morning newspaper will be stale later the same day.

How does the majority distinguish between concrete that hardens and news that becomes stale?  The hardened concrete, if not formed, and the old newspaper both lose substantial value.  Petitioner, however, ordered no more concrete than it needed or could use in a particular period of time, and the incidence of wasted or unused and hardened concrete was not a financial factor or risk in petitioner's business.  To the contrary, after the concrete was poured, petitioner had created a valuable product for which it would receive payment.

In addition, the lack of inventory on hand has already been held not to be determinative of the question of whether merchandise is an income-producing factor for the application of the accrual method.  See, e.g., J.P. Sheahan Associates, Inc. v. Commissioner, T.C. Memo. 1992-239.  Also, the fact that

merchandise may only briefly be in the possession of the seller is of no consequence. See, e.g., <u>Addison Distrib., Inc. v. Commissioner</u>, T.C. Memo. 1998-289.

The conclusion that a product with a limited commercial life cannot be merchandise defies reason. In <u>Asphalt Prods. Co. v. Commissioner</u>, 796 F.2d 843 (6th Cir. 1986), affg. on this issue, revg. in part, and remanding <u>Akers v. Commissioner</u>, T.C. Memo. 1984-208, revd. on another issue 482 U.S. 117 (1987), it was held that a seller of asphalt to contractors like the one in <u>Galedrige Constr., Inc.</u>, should be on the accrual method because it held merchandise/inventory to be for sale. Is the asphalt or concrete less ephemeral for the person who supplies it? If a supplier of asphalt or concrete also contracted to pour and place it for customers, would it have to use differing methods of accounting for each activity? If taxpayers sell products that spoil easily, should those taxpayers be exempt from the section 471 or section 446 requirements if they otherwise fall within the statute's reach? The answer to these questions should be "no", and the <u>Galedrige</u> holding is in error.

(d) <u>Osteopathic Med. Oncology & Hematology, P.C. v. Commissioner, 113 T.C. 376 (1999), Is Factually Distinguishable From the Circumstances in This Case</u>--<u>Osteopathic Med. Oncology & Henatology, P.C.</u>, was a Court-reviewed opinion in which 10 of 16 participating Judges joined in the majority's findings and holding, and 4 of 16 joined in the dissent specifically

disagreeing with the majority's findings and holding. Of the remaining two Judges, one dissented without comment and one concurred in the result but did not join the majority. To be sure, the majority's opinion in Osteopathic Med. Oncology & Hematology, P.C., is the view of this Court, but it is substantially a factual finding that the drugs in that case were a supply consumed in the performance of a service and that the drugs were not merchandise.[6] In any event, the case before us now does not involve a medical practice, the administration of drugs, or hybrid accounting methods. The facts we consider here involve the use of relatively substantial amounts of materials to construct finished products.

The question of whether an accounting method clearly reflects income is a factual question that is decided on a case-by-case basis. See Hamilton Indus., Inc. v. Commissioner, 97 T.C. 120, 128-129 (1991). Without detailing all of the findings in Osteopathic Med. Oncology & Hematology, P.C., it should suffice to understand that the chemotherapy drugs were consumed in the patients' bodies. The physicians were treating patients' illnesses by administering drugs into the patients' bodies. Although there was disagreement about whether the drugs were merchandise or a supply, Osteopathic Med. Oncology & Hematology,

_____

[6] See, however, Judge Halpern's dissenting opinion indicating that the majority's conclusion may constitute a rule of law as it relates to businesses involved in medical practices. Osteopathic Med. Oncology & Hematology, P.C. v. Commissioner, 113 T.C. 376, 402 (1999) (Halpern, J., dissenting).

P.C., presents a situation where the conclusion that the drugs are consumed in the performance of a service is easier to make. Clearly, no product resulted from the administration of drugs into patient's bodies.

The purchase of materials and construction of them into finished products in this case is not easily transformed into being "an indispensable and inseparable part" of a service. Majority op. p. 19. As already explained in this dissenting opinion, petitioner purchased materials and sold them to customers in the form of a finished product. The very reasons for finding the drugs to be supplies consumed in performing a service in Osteopathic Med. Oncology & Hematology, P.C., are the antithesis of the circumstances presented in this case where finished products result from petitioner's labors.

(2) Whether Respondent Abused His Discretion

Finally, the majority in this case finds irrelevant the fact that petitioner had accounts receivable of $294,436 for its very first year, in which it reported $64,806 of taxable income under the cash method. The majority relies on section 448 for its conclusion that petitioner's failure to meet the substantial-identity-of-results test is irrelevant because that section allows certain taxpayers to use the cash method and/or not maintain inventories. The majority also finds significant the holding in Ansley-Sheppard-Burgess Co. v. Commissioner, 104 T.C. 367, 377 (1995).

Section 448 permits certain smaller businesses to use the cash method, but it does not preclude the Commissioner from determining, as was done here, that a taxpayer's method does not clearly reflect income. Section 448 was argued by petitioner on brief to the extent that petitioner contended that it was within the $5-million maximum limitation of that section. Respondent made no comments in his brief concerning section 448 but instead relied on the argument that petitioner failed to show that its method (cash) clearly reflected income; i.e. that respondent abused his discretion.

Respondent's discretion to determine that petitioner's method does not clearly reflect income is derived from section 446 and is not obviated by section 448. Although section 448 may enable smaller businesses to use the cash method, it also effectively abolishes the use of the cash method for all other taxpayers.[7] Where a taxpayer is qualified under section 448,[8] the cash method may be used if the taxpayer can show that the cash method more clearly reflects income. Section 448 cannot be treated as a complete answer to our inquiry. To do so would ignore the statute, regulations, and our case precedent that hold

---

[7] Congress' enactment of sec. 448, in part, reflects its acceptance that the cash method results in mismatching, but it did not make its use by small taxpayers into a safe haven from the exercise of the Commissioner's discretion under sec. 446.

[8] There has been no showing here that petitioner is in all respects qualified under sec. 448. In addition, the parties did not stipulate that petitioner was qualified under sec. 448.

that taxpayers may be required to use the inventory and/or
accrual method even though they do not have goods on hand.  To
use the lack of inventory on hand as a reason to hold that
respondent has abused his discretion is, likewise, not
appropriate.[9]  Although the opinion in Ansley-Sheppard-Burgess
Co. v. Commissioner, supra, focused on section 448, the parties
in that case stipulated that the taxpayer did not maintain an
inventory and met the requirement of section 448(b)(3).  In this
case, no such agreement exists.

In this case, petitioner is not exempted from showing that
the cash method clearly reflected its income by any of the
expedients relied upon by the majority.  Moreover, petitioner has
not shown that respondent's determination was plainly arbitrary.
The use of Osteopathic Med. Oncology & Hematology, P.C. v.
Commissioner, supra, as a pervasive rule that income from
services, by definition, cannot involve the sale of goods or
merchandise would be unsound.[10]  The majority's holding here
would have the effect of overruling numerous cases, including
several involving similarly situated taxpayers engaged in the
construction industry.  The effect of the majority's holding is
to exempt contractors in the construction industry from sections

---

[9] That reasoning is further weakened by petitioner's failure
to show that no materials were on hand at the close of its
taxable year.

[10] For example, at the other end of the spectrum, a service
(as opposed to self-service) grocery store provides many services
for its customers in connection with the sale of its merchandise.

446 and 471 if the materials they purchase/sell are used in constructing part of an addition to real estate.  The majority's approach would confer preferential treatment on a limited class of taxpayers without congressional mandate.

COHEN, RUWE, HALPERN, and THORNTON, <u>JJ</u>., agree with this dissenting opinion.

HALPERN, J., dissenting:

I. Introduction

Petitioner is a concrete contractor, licensed by the State of California to construct, place, and finish concrete foundations and flatwork. In performing its work, petitioner uses ready-mix concrete, sand, rock, various hardware items, and lumber (the materials), all of which (except, possibly, the lumber) belong to someone else at the end of the job. For the taxable year in question, petitioner treated as an expense, and deducted on its Federal income tax return, all payments actually made by it during the year for the materials. It included in gross income only payments actually received by it during the year.

The majority addresses the question of whether petitioner must take inventories. In pertinent part, section 1.471-1, Income Tax Regs., provides: "In order to reflect taxable income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor." The majority decides that petitioner need not take inventories. It does so on the following basis:

> We have found that petitioner's contracts with its
> real property developer clients are service contracts,
> that the material provided by petitioner is
> indispensable to and inseparable from the provision of
> that service, that the materials lost their separate
> identity to become part of the real property in the
> construction activity, and that, in substance, no sale
> of merchandise occurred between petitioner and its

clients.  The bottom line is that petitioner did not hold merchandise for sale and there simply was no sale of merchandise between petitioner and its clients.  See Osteopathic Med. Oncology & Hematology, P.C. v. Commissioner, supra [113 T.C. 376 (1999)]; Honeywell, Inc. v. Commissioner, supra [T.C. Memo. 1992-453].  [Majority op. pp. 33-34]

The majority recognizes that petitioner provides a mix of goods and services.  Rules of law to decide whether taxpayers providing a mix of goods and services are producing, purchasing, or selling (without distinction, selling) merchandise that is an income-producing factor have proved elusive.  See Schneider, Federal Income Taxation of Inventories, sec. 1.02, particularly at 1-13 through 1-26 (2000).  The majority has attempted to craft such a rule of law.  The majority looks to Osteopathic Med. Oncology & Hematology, P.C. v. Commissioner, 113 T.C. 376 (1999), which applies a rule of law of questionable, but narrow, application; viz, that medical practice is inherently a service business.  The majority extracts from that case the dubious proposition that we can define the inherent nature; i.e., define the essential constituent, of a service business.[1]  The majority would test for that constituent as the principal determinative of whether a business is selling merchandise.  The majority has disregarded precedent and, in my opinion, left the law less settled than before.

---

[1]Inherent means:  "Existing as an essential constituent or characteristic; intrinsic."  The American Heritage Dictionary 928 (3d ed. 1992).

II.  Discussion

A.  Introduction

I distill the following rule of law from the majority's analysis:  A taxpayer is not selling merchandise to customers when the material in question is integral to the provision of a service.  See majority op. p. 15.[2]  The principal difficulty that I have with the test (the integral-to-service test) implicit in the majority's rule is that it does not accommodate many of the factors that have proved useful in deciding whether the provider of a mix of goods and services is selling merchandise that is an income-producing factor.

B.  Traditional Factors

For example, under the integral-to-service test, what role, if any, is left for the traditional inventory-determinative factors of ownership, risk, and relative cost?

Under the integral-to-service test, is the fact that ownership of the materials vests in the taxpayer irrelevant?  If not, how does that fact influence the determination of whether the materials are integral to the service?  See Surtronics, Inc. v. Commissioner, T.C. Memo. 1985-277 (electroplator purchasing gold and silver to apply to customer's components was required to

_____

[2]The principal meaning of the word "integral" is "Essential or necessary for completeness; constituent".  American Heritage Dictionary 937 (3d ed. 1992).  The word "integral" expresses nicely the concept of "indispensable and inseparable" that the majority lifts from Osteopathic Med. Oncology & Hematology, P.C. v. Commissioner, 113 T.C. 376 (1999).

use inventories); Epic Metals Corp. v. Commissioner, T.C. Memo. 1984-322 (taxpayer's failure to prove that title to goods did not pass to it decisive to decision rejecting its argument that, in arranging the sale of goods between two other parties, it was only a broker selling its services and was not a seller itself), affd. without published opinion 770 F.2d 1069 (3d Cir. 1985).

What about risk of loss?  Assume that the taxpayer bears the risk of loss with respect to materials destroyed during production or if performance under the contract is rejected.  Is that fact, likewise, irrelevant?  If not, how does it influence the required determination?  In Fame Tool & Manufacturing Co. v. Commissioner, 334 F. Supp. 23 (S.D. Ohio 1971), the taxpayer manufactured tools and dies to order.  It maintained no finished inventory, had a substantial amount of work in progress, and the average time to complete an order was 1 or 2 weeks.  Since the end product manufactured by the taxpayer had to satisfy the customer's specifications, if the tool or die failed to meet those specifications, it was rejected and had to be scrapped. The percentage of rejects varied widely.  The taxpayer argued that, since it was a "pure" tool and die maker, as distinguished from a precision manufacturer, it provided a service and, therefore, there was no "merchandise" or any "production" within the meaning of section 1.471-1, Income Tax Regs.  The District Court rejected that argument, relying on Wilkinson-Beane, Inc. v. Commissioner, 420 F.2d 352 (1st Cir. 1970), affg. T.C. Memo.

1969-79, for the rule that the taxpayer was required to take inventories even if he was partly or mainly performing a service. The District Court pointed out that the taxpayer's argument that it was a service provider would have been stronger if it had subcontracted out the actual production of the tools and dies: "[I]nasmuch as the customer is obviously only interested in getting a tool or die to his specifications, regardless of who made it". Fame Tool & Manufacturing Co. v. Commissioner, supra at 28.

Finally, in applying the integral-to-service test, what weight do we give to a comparison of the relative costs of the materials and labor constituting the taxpayer's work product (assuming that the taxpayer had title to the materials)? Compare Drazen v. Commissioner, 34 T.C. 1070, 1078-1079 (1960) (taxpayers arguing for inventories--(to put them on the accrual method, so they could accrue deferred payments against current costs)--did not have sufficient manufacturing operations to require inventories) with Thompson Elec., Inc. v. Commissioner, T.C. Memo. 1995-292 (substantiality of material costs compared to receipts taken into account in determining whether material is a substantial income-producing factor).

Shasta Indus., Inc. v. Commissioner, T.C. Memo. 1986-377, is a traditional factor case that, apparently, would come out differently under the integral-to-service test. The taxpayer, a swimming pool contractor, constructed custom-designed, in-ground

swimming pools.  We found the physical construction process

utilized by the taxpayer to be as follows:

> The layout site was excavated including dynamiting or
> other special techniques if necessary.  The plumber
> installed the filter, pump, motor, and the skimmer.
> Steel reinforcing bars were used to form a metal basket
> to fit the excavation and form the shape of the pool.
> Wiring was then added to the pool site.  The necessary
> electrical work was done before the concrete was
> poured, covering the steel, plumbing and electrical
> work.  Tile was placed around the pool surface and the
> deck around the pool was constructed.  Final details of
> construction were the cleanup of the pool area, setting
> of the turbos, and plastering of the pool.  Equipment
> needed to service the pool was then delivered to the
> pool site and the operation of the pool was explained
> to the customer.  [Id.; emphasis added.]

We also found:  "Although most supplies came from the warehouse,

some materials such as concrete and tile were purchased for

specific contracts and normally delivered directly to the pool

site."  (Id.; emphasis added.)

The question before us was whether the taxpayer could use

the LIFO method for its inventory of partially completed swimming

pools.  The taxpayer overcame the argument that the completed

contract method precluded the use of LIFO, as well as the

argument that the swimming pools were not inventory because they

constituted improvements to land.  We held that inventories are

necessary in order to reflect taxable income correctly in every

case in which the sale of merchandise is an income-producing

factor, citing Wikstrom &  Sons, Inc. v. Commissioner, 20 T.C.

359 (1953), for the proposition that inventories are required

when merchandise is produced in accordance with customer

specifications.  Also, we found that the taxpayer was maintaining inventories in the form of materials and work in process, and <u>not</u> in the form of real estate to which it held title or in the form of improvements to its own real estate.  On that basis, we distinguished <u>Miller Dev. Co. v. Commissioner</u>, 81 T.C. 619 (1983) (real estate and improvements to real estate are not normally considered "merchandise" for purposes of determining whether the use of inventories is permitted to the taxpayer).

<u>Shasta Indus., Inc. v. Commissioner</u>, <u>supra</u>, is a Memorandum Opinion.  Therefore, we applied settled law to the facts before us.  Those facts and the facts before us today are quite similar, yet, today, we reach a different result.  I assume, therefore, that settled law has changed.

C.  <u>The Integral-to-Service Test</u>

The majority finds that petitioner's business is inherently a service business.  See majority op. pp. 19, 23.  As stated, the majority does not identify the essential constituent that marks the inherent nature of a service business.  In <u>Osteopathic Med. Oncology & Hematology, P.C. v. Commissioner</u>, <u>supra</u>, we found the chemotherapy drugs in question were unavailable to the ultimate consumers, the patients, without the intervention of a physician, and they had to be injected into the patient by a physician or nurse.  The analogy to the case at hand is weak.  Here, the materials could be purchased by anyone, and the only distinguishing characteristics of petitioner were its license and

its skill to do the work involved.  Do we thus conclude that the essential constituent of a service business is the requirement of some level of skill or the necessity of some Government license to carry it out?  Do we not make a distinction without a difference when we suggest that we can divide the class of businesses that deliver a mix of goods and services on the basis of those that are inherently service businesses and those that are not?

In Rev. Rul. 74-279, 1974-1 C.B. 110, the Commissioner dealt with a taxpayer engaged in business as an optometrist.  The taxpayer not only examined eyes and prescribed corrective lenses (which requires a license) but also sold frames and eyeglasses. The ruling holds that, although the taxpayer provides various services, there is also a substantial amount of merchandise sold, and, therefore, inventories are required.  Not surprising.  But how does the optometrist fare under the integral-to-service test? I assume that the business of optometry (at least when limited to examining eyes, diagnosing defects, and prescribing corrective lenses) is inherently a service business under that test.  Cf. Osteopathic Med. Oncology & Hematology, P.C. v. Commissioner, supra.  But the business of filling the prescription for the corrective lenses also involves the optometrist's performing a service.  The service requires skill and, in some jurisdictions, it requires a license.  See, e.g., Cal. Bus. & Prof. Code sec. 2550 (West 1990 & Supp. 1999).  Therefore, filling the

prescription is inherently a service business under the integral-to-service test.  I assume that the lenses and frames are integral to that service.  If so, under the integral-to-service test, the lenses and frames are not merchandise within the meaning of section 1.471-1, Income Tax Regs.

The integral-to-service test is different; it changes the emphasis of the inquiry that, traditionally, has served; it brings into play new factors, which will encourage the reexamination of settled questions.  For instance, consider the hotel and restaurant business.  The courts have consistently held that the sale of large amounts of food, beverages, and tobacco is a sufficient basis upon which to predicate the use of inventories.  See, e.g., Dwyer v. Commissioner, a Memorandum Opinion of this Court dated June 29, 1951 (inventories necessary for hotel and restaurant business since purchase and sale of wines, liquors, and beers is an income-producing factor), affd. on other issues 203 F.2d 522 (2d Cir. 1953); Schuyler v. Commissioner, a Memorandum Opinion of this Court dated May 11, 1951 (similar; purchase and sale of food, beer, wine, liquor, and tobacco products), affd. on other issues 196 F.2d 85 (2d Cir. 1952).  Do we now give license to challenge that orthodoxy? Restaurants do not sell tobacco products anymore, and liquor may give them pause, but can fancy French restaurants (or large food service operations) now argue that they need not inventory their comestibles since they are inherently a service business, with

peas, carrots, truffles, and boeuf being integral to that service?  What about the proliferation of dot.com businesses, whose added value is generally some service, such as the ability to shop at home for merchandise, such as books or music, that used to require a trip to the store?  I fear that our new rule may be misunderstood.[3]

III.  <u>Conclusion</u>

Leslie J. Schneider, in his treatise, Federal Income Taxation of Inventories, writes:  "Notwithstanding the fact that the inventory issue is raised in a variety of contexts, the issue is resolved by a consideration of the same basic question--is the production, purchase or sale of merchandise an income-producing factor?"  Schneider, <u>supra</u> at 1-12.  I would take into account the traditional factors to determine whether petitioner's method of accounting clearly reflects its income.  For many of the reasons stated by Judge Gerber, I would conclude that it does not.

COHEN, RUWE, GERBER, and THORNTON, <u>JJ</u>., agree with this dissenting opinion.

---

[3]Indeed, I am not that sure how well the majority understands it.  The majority's discussion of the integral relationship of the materials to petitioner's service relies on an old-style factor analysis.  Judge Gerber, in his dissent, does a good job of criticizing that analysis.